# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-DP-00504-SCT

*ALBERTO JULIO GARCIA a/k/a ALBERTO J.*
*GARCIA a/k/a ALBERTO GARCIA*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/25/2017 |
| TRIAL JUDGE: | HON. LISA P. DODSON |
| TRIAL COURT ATTORNEYS: | JOEL SMITH |
| | HERMAN F. COX |
| | WILLIAM CROSBY PARKER |
| | LISA D. COLLUMS |
| | JASON McDONALD PAYNE |
| | ANGELA BROUN BLACKWELL |
| | BILLY EDWARD STAGE |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: ALISON R. STEINER |
| | ANGELA BROUN BLACKWELL |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: CAMERON LEIGH BENTON |
| DISTRICT ATTORNEY: | JOEL SMITH |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 05/14/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

      **EN BANC.**

      **MAXWELL, JUSTICE, FOR THE COURT:**

¶1. After a twelve-hour search, police found the dead body of a missing five-year-old girl. Her body was located in a filthy, abandoned trailer fifty yards from her apartment complex. She had been sexually assaulted, vaginally and anally, and then hanged by the neck with a pair of socks tied to a window crank. Twenty-nine-year-old Alberto Garcia, a resident of the same apartment complex, confessed to killing the child in the course of raping her. Forensic evidence confirmed Garcia's DNA had been found in the child's vagina and anus.

¶2. On the eve of his capital-murder trial, Garcia pled guilty. He also waived his right to a jury at sentencing. Following a three-day hearing, the trial judge, the Honorable Lisa Dodson, found two aggravating circumstances—the young victim was killed during the course of a sexual battery and the nature of the capital offense was especially heinous, atrocious, and cruel—outweighed the mitigating factors of Garcia's lack of significant criminal history, relatively young age, and difficult childhood. Based on these findings, she sentenced Garcia to death.

¶3. Garcia appeals his sentence only.[1] Applying the heightened scrutiny that a death-penalty appeal demands, we find no merit to Garcia's claims the trial judge erred in her sentencing decision. Because the death penalty is constitutional and because Garcia's death sentence is proportionate to other sentences imposed for the capital murder of a young sexual-assault victim, we affirm his sentence of death.

**Facts & Procedural History**

**I.      JT goes missing and is later found hanged.**

---

[1] Because he pled guilty, Garcia has no right to appeal his underlying capital-murder conviction. *See* Miss. Code Ann. § 99-35-101 (Rev. 2015).

¶4. On the evening of July 16, 2014, five-year-old JT[2] was running in and out of the patio door of her apartment, playing with a neighbor outside. Around 5:30 p.m., her mother called to her, but JT did not answer. After two hours of searching, JT's mother called 911. Police, neighbors, and volunteers systematically searched the area through the night.

¶5. At 7:45 a.m. the next morning, police found JT's half-naked body in the bathroom of an abandoned trailer approximately fifty yards from JT's apartment. She had been hanged with a pair of socks tied around her neck and fastened to the shower window. There were signs of sexual penetration of her vagina and anus. There were also scratch marks around her neck showing she had tried to free herself from the makeshift noose before she died from ligature strangulation.

**II.     Garcia approaches the police.**

¶6. Based on a tip, investigators developed a person of interest—one of JT's neighbors in the apartment complex, Julian Casper Gray. As police searched Gray's apartment the evening of July 17, Garcia, Gray's friend and neighbor, engaged the police commander in conversation. Because Garcia appeared to be volunteering information relevant to the investigation, a detective went to Garcia's apartment. He asked Garcia if he would be willing to speak with investigators at the police station.

¶7. Garcia agreed. On the ride to the police station, Garcia mentioned that his fingerprints would likely be found in the trailer because he had been in the trailer the weekend before. At the station, another detective formally interviewed Garcia after reading Garcia his

---

[2] This opinion refers to the child victim by her initials only.

3

*Miranda* rights and obtaining a waiver. *See **Miranda v. Arizona***, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) (requiring that, before a custodial interrogation, the person interrogated be warned he has a right to remain silent, that any statement he makes may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed). Garcia told the detective he had stolen some items from the trailer a few days earlier. So his fingerprints and possibly DNA would be in the trailer. He also mentioned his semen may be in the trailer because he had masturbated there while visiting the trailer's prior occupants. Garcia claimed he had possibly blacked out around the time of JT's disappearance and that he woke up with feces on his penis and inner thighs. Garcia said the feces was not his.[3] And he immediately took a shower and washed his clothes. The interview ended when Garcia asked for a lawyer.[4]

¶8.    Based on this information, police obtained a search warrant for Garcia's apartment. In his bedroom, police found an Xbox 360 game console, which was connected to the internet. A digital forensic examiner recovered the internet searches made on the console in

---

[3] During his guilty plea, Garcia admitted JT defecated on him when he penetrated her anus with his penis.

[4] A few days later, Garcia requested a second interview with the same detectives. This time, he insisted he had not blacked out during the time JT went missing. He also backtracked from his earlier admission that he had showered because his penis and thighs were covered in someone else's feces. Instead, Garcia told the detectives that Gray had come to his apartment asking for help. Garcia said he followed Gray to the abandoned trailer where he found JT tied to a chair in the bedroom. Garcia admitted that he helped move JT's body to the bathroom, where he tried to rinse feces and semen off JT. Garcia also admitted using the socks tied around JT to hang her by the crank on the window. During this interview, Garcia insisted he had not sexually assaulted JT. He explained, however, that his semen was possibly on JT's body because when Gray came to his apartment, Garcia had just finished masturbating and had not washed his hands before going to the trailer.

the days leading up to JT's rape and murder. These search phrases included "toddler hentai,"[5] "poor little thing," "kidnapped and raped," and "virginravisher."

¶9. Garcia was arrested and held without bond. On October 5, 2015, a grand jury indicted Garcia for capital murder in the commission of felony sexual battery.

**III. Garcia moves to suppress his statements.**

¶10. On July 15, 2016, Garcia moved to suppress the Xbox search and his statements to the police. He claimed his apartment was illegally searched because he had never been read his *Miranda* rights before being recorded in the police car. He suggested his statement on the way to the police station and all his following statements and evidence were "fruit of the poisonous tree." *Marshall v. State*, 584 So. 2d 437, 438 (Miss. 1991) (explaining the "fruit of the poisonous tree" doctrine—also known as the exclusionary rule—deems inadmissible any evidence obtained incident to an unlawful search or seizure (citing *Murray v. United States*, 487 U.S. 533, 536, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988))).

¶11. On July 26, 2016, the trial court held a suppression hearing. Police Commander Ken Brown testified that, on July 17, 2014, during the search of Gray's apartment, he was in the hallway when Garcia approached him and asked about the investigation. At this point, Garcia was not a person of interest or a suspect. This conversation was relayed to Detective Clay Fulks. Detective Fulks, a patrol officer in July 2014, followed up by going to Garcia's apartment. Garcia volunteered to go to the police station to provide information. While Garcia chose to ride in the back of the police car, he was not restrained. Detective Fulks

---

[5] According to the forensic examiner, a "hentai" is a sexually explicit anime or cartoon.

activated the vehicle's recording system. During the fifteen-minute drive, the two engaged in a casual conversation. But at some point Garcia mentioned that his fingerprints may be found in the trailer where JT was discovered. Garcia explained that he knew the trailer's former occupants. Detective Fulks testified that, at this point, Garcia was not a suspect. When they arrived at the station, Detective Fulks parked in the front parking lot and not at the sally port where suspects are delivered. Detective Fulks testified Garcia was one of three witnesses he transported to the police station during the investigation.

¶12.    During Detective Fulks's testimony, the State played the recording of the fifteen-minute ride to the police station. The trial court ruled the video could come in as evidence against Garcia. Garcia was not in custody at the time. And it was clear from the video that Garcia was the one who started the conversation. He volunteered, without being asked, that his fingerprints would be found in the trailer because he had been there just days before, rummaging through the prior occupants' belongings.

¶13.    The trial court also ruled that the search warrant for Garcia's apartment had been supported by probable cause—namely, the statement Garcia gave to investigators at the police station after he voluntarily waived his ***Miranda*** rights.[6]

**IV.    Garcia moves to change venue.**

¶14.    At the same July 26, 2016 hearing, the trial court took up Garcia's motion to change venue, which he had filed July 14, 2016. In his motion, Garcia argued there was a reasonable

---

[6] In his recorded interview at the police station, Garcia told the detectives they would find items that Garcia took from the trailer in his apartment. Garcia was separately charged with burglary.

likelihood that an impartial jury could not be impaneled in the First Judicial District of Harrison County. He asserted the disappearance and death of JT was "sensational, front-page news throughout the Gulf Coast region." To support his motion, he attached copies of various media reports, along with affidavits by three community members. *See* Miss. Code § 99-15-35 (Rev. 2015) (requiring a motion to change venue be "supported by the affidavits of two or more credible persons").

¶15. At the hearing, Garcia, the State, and the trial court agreed to the following procedure: Garcia would present his evidence supporting the motion, and the State would present its evidence opposing the motion. Then, the question of pretrial publicity would be put to fourteen people who had been summoned but not selected for jury duty for an unrelated trial being held that day. But after Garcia and the State presented their arguments and evidence, the court learned the case scheduled for trial had ended in a guilty plea, so there were no jurors to question. After further discussions, Garcia, the State, and the court agreed to defer the rest of the hearing until another mock jury was available.

¶16. Three weeks later, on August 16, 2016, the change-of-venue hearing resumed. As agreed, the court brought in thirty prospective jurors who were not seated in an unrelated trial taking place that day. They were questioned by the trial judge about their knowledge of the pretrial publicity surrounding JT's murder and Garcia's arrest. After general questions were asked, fourteen jurors were seated and asked additional detailed questions by Garcia's

7

counsel and the State.[7]  From their responses, the trial court concluded that "a fair and impartial jury can be seated, given proper and thorough voir dire."

¶17.   The trial court also weighed other factors—the fact the case was capital, the lack of evidence of threats of violence against Garcia, and the media coverage, which the court determined was not "an inordinate amount."  *See White v. State*, 495 So. 2d 1346, 1349 (Miss. 1986) (enumerating factors that when present indicate the presumption that a fair trial cannot be had in the jurisdiction where the crime occurred is irrebuttable).  The court denied Garcia's motion to change venue.

## V.    The trial court considers Garcia's competency.

¶18.   On November 22, 2016, the trial court heard testimony from forensic psychologist Dr. Robert Storer on a "possible competency issue."

¶19.   After evaluating Garcia, Dr. Storer testified that, in his expert opinion, Garcia was not competent to stand trial.  While Garcia had no intellectual deficits, there was a "constant theme of anxiety" in his life.  Dr. Storer noted that Garcia had suffered at least one panic attack while at court.  And if Garcia became anxious, Dr. Storer opined, he would be unable to participate in trial and interact with his attorneys.  Dr. Storer also expressed doubt about Garcia's ability to make rational decisions concerning his legal situation.  When asked, Garcia said he would prefer death over a life sentence due to the solitary confinement of death row.  Dr. Storer recommended Garcia get long-term treatment for his anxiety, which

---

[7] Once seated in the jury box, these fourteen people were told they would not serve as the actual jury in Garcia's case.  Instead, they would be asked questions about pretrial publicity so the court could determine if the accused would receive a fair trial.

8

could be administered in jail. Dr. Storer opined that thirty days of treatment would be enough for Garcia to experience a "different outcome." Dr. Storer said he would wait until after this treatment period was over before completing his full forensic report.

¶20. The trial judge then questioned Dr. Storer more carefully. She first asked if Dr. Storer was aware that the day of Garcia's alleged panic attack, Garcia had not been administered his regular medication. She also asked if Dr. Storer was aware that Garcia had no problem during the court proceedings. Rather, as court recessed for lunch, Garcia told his attorneys that he felt uncomfortable. The trial judge then asked Dr. Storer about his earlier comment that Garcia had responded appropriately to the questions asked by the court and that Garcia fully understood what was going on. Dr. Storer reiterated that Garcia's intellectual functioning was fine. He also explained that his anxiety disorder "is not a severe and persistent mental illness of the type that would alter someone's perception of reality." But Dr. Storer cautioned that Garcia's anxiety "shuts him down to where he's not paying attention and listening and processing information, and he's not able to ask questions of his attorneys as appropriate or point things out."

¶21. Finally, the trial judge asked what was illogical or irrational about Garcia's preferring his own jail cell. Before Dr. Storer answered, the judge interjected,

> [L]et me tell you that for many years I have expressed the opinion that if I were in this position, I would rather have the death penalty than a life without [parole] for several reasons. One of which is that I would have my own cell where no one else would be and my own things that no one else would bother. I don't find that at all irrational. I find it very much like those who perhaps have a life-threatening disease make a choice either for treatment or no treatment. So tell me why it's irrational in this case.

9

Dr. Storer responded that his concern was that Garcia's decision-making ability may be impacted by his anxiety disorder. But he could not say to a reasonable degree of psychological certainty that this was so.

¶22. After speaking with Garcia, who said he was "feeling fine" that day, the trial judge made her ruling:

> [B]ased on the testimony, and of course my observances of Mr. Garcia, it does not appear to me that he is in any manner incompetent in terms of intellectual functioning or his ability to understand and appreciate what is going on or in fact in his ability to consult with his attorneys.
>
> I do have some question, based on Dr. Storer's testimony, with regard to if we were to go to trial, how he would handle that in the courtroom because I do recall that at some point it was reported to me that he was beginning to experience some anxiety on one of our hearings previously.
>
> It was also reported to me he had not received his medication that morning, and the nurse I believe actually traveled here to the courthouse to provide him with that. And he did much better and was much more relaxed, insofar as my observations, for the portion after the lunch break.
>
> It appears to me that clearly he could participate during trial. And I think that based on that, we probably need to follow Dr. Storer's recommendation in that regard and have Mr. Garcia seen by whomever at the jail can make the determination as to the appropriate medication and determine if, in fact, they believe a long-acting medication would be better than what he is taking or a different dose of what he's taking would be better and to allow him that 30 days to get that, as I understand it, therapeutic level is what Dr. Storer is talking about, and then have Dr. Storer again speak with him in that regard.
>
> So at this point I find him competent but for that potential issue, and I'll reserve that issue to see if in fact the medication which Mr. Garcia states he's more than willing to take because it seems to make him feel better and function better, and we'll see what sort of result that has because I think at this point he probably could make it through a trial, and he probably would do all right going through a trial.

But I think it would take a great deal of patience on his part and his attorney's part. It might take more frequent breaks, et cetera. And once we're into the trial, it would be very difficult at that point. If in fact he did have one of these as attacks and was unable to participate, we would be unable to move forward. so I think the better course is to try to treat this first and see where we stand in about 30 days.

¶23. The trial judge concluded the hearing by addressing Garcia directly about his stated preference for the death penalty:

Judge: Now, Dr. Storer says you have a preference in this case that you've expressed to him about sentencing. I've told him an opinion I've held for some time about sentencing. I don't want you to be swayed by my opinion one way or the other.

Garcia: No, ma'am. I won't.

Judge: Because I'm not in your situation.

Garcia: I understand, ma'am.

Judge: It's an academic exercise for me in terms of my years of practice, et cetera. So I don't want you to be swayed by that. I asked him that because I wanted to know really truly what he was thinking on that.

Garcia: Yes, ma'am. I understood about that.

## VI.   Garcia moves to exclude Xbox searches.

¶24. The following month, on December 8, 2016, the trial court took up Garcia's motion in limine to exclude the explicit searches on the Xbox 360 based on lack of authentication and unfair prejudice. *See* M.R.E. 901; M.R.E. 403. Garcia argued there was no proof he was the one who made those internet searches and that the probative value of the evidence was outweighed by unfair prejudice.

11

¶25.   Detective Sam Jewell testified for the State.  He explained that while Garcia lived in a two-bedroom apartment with another family,[8] that family was out of town the week of JT's disappearance and death.  Detective Jewell testified he seized the Xbox from Garcia's bedroom, which Garcia did not share with anyone.  On cross-examination, Detective Jewell admitted it was possible that another person could have used the Xbox the week of July 10-18, 2014, including Julian Gray, who at the time of the suppression hearing was under indictment for possession of child pornography.  The State also called the digital forensic examiner with the FBI.  This examiner was responsible for validating the sexually explicit search queries the week of JT's disappearance and death.  On cross-examination, the examiner acknowledged that the user name for the Xbox account was "dummy" with no password protection.

¶26.   The trial judge denied Garcia's motion in limine.  On the question of authenticity, the judge found,

> There is also no proof that anyone else actually accessed the Xbox during the relevant time period. There's nothing to indicate that anyone else was in the room, had access to the Xbox, and certainly there's a possibility it was used by other people, it was moved other places, et cetera. Anything is possible. It could have floated at some point. But that's not likely either.

¶27.   Based on the State's witnesses' testimony, the trial judge ruled the State sufficiently authenticated that the searches actually came from Garcia's Xbox.  It would be up to a jury to decide how much weight to give this information and if Garcia, Gray, or someone else

---

[8] The family consisted of a coworker of Garcia's, the coworker's wife, and their two small children.

made the searches. At this point, the judge found no basis to exclude the Xbox searches on authenticity grounds.

¶28. The trial judge also rejected Garcia's unfair-prejudice argument.

**VII. The trial court holds pretrial omnibus hearing.**

¶29. On December 20, 2016, the trial court held a pretrial omnibus hearing. Of note for this appeal, when the judge reached the issue of competency, she asked Garcia's counsel, "[A]t this point, . . . there's no claim of incompetency to stand trial but for this anxiety issue we've already addressed, and that's not really a competency issue so much as a being able to pay attention and participate, right?" To which Garcia's counsel responded, "That's correct, Your Honor."

**VIII. The trial court revisits Garcia's anxiety issue.**

¶30. On January 12, 2017, the week before the scheduled trial, the trial court held a hearing "to follow up on Dr. Storer's earlier testimony concerning the anxiety issue."

¶31. Dr. Storer testified that, after Garcia received medical treatment for his anxiety, Dr. Storer reevaluated Garcia in front of Garcia's entire legal team, plus a dozen officers, to create as close as possible the courtroom setting. While Garcia still had anxiety disorder, in Dr. Storer's opinion the medical intervention had been effective to the point that there was no significant interference with Garcia's competency-related abilities. Dr. Storer found Garcia competent either to stand trial or to enter a guilty plea and waive his constitutional rights.

¶32. The trial judge then entered her ruling:

13

All right. Then at this point, clearly the court previously found that Mr. Garcia was competent with regard to his mental functioning, his intellectual abilities, et cetera.

But there was some concern with not purely competence, but his ability to be in the courtroom and to fully participate in his defense, to communicate with his counsel, if he choose[s] to do so, to be able to testify.

And that was all tied to this anxiety disorder and his feeling a heightened level of anxiety in the courtroom. . . . Based though, on Dr. Storer's testimony as well as the court's observations of Mr. Garcia, it appears that that matter has been fully addressed with regard to this new medication and perhaps these new interventions that Dr. Storer testified to.

And so it appears to me that Mr. Garcia is fully competent and fully able to go forward in his matter, to make all necessary decisions with regard to assertion of his rights, waiver of his rights if he chooses to waive any, testifying if [he] chooses to testify, going to trial if that is his choice or entering a guilty plea if that is his choice.

## IX.    Garcia moves to waive a jury for sentencing.

¶33.    On January 17, 2017, the day before his scheduled trial, Garcia filed a motion for sentencing by the judge without a jury present. *See* Miss. Code Ann. § 99-19-101(1) (Rev. 2015) (conferring the statutory right to jury sentencing upon conviction or adjudication of guilty of capital murder).  The judge held a hearing on the motion the same day.

¶34.    The  hearing mainly consisted of the trial judge's advising Garcia of the rights he would be giving up and ensuring Garcia understood the difference between having a jury of twelve of his peers versus one judge sentence him.  In particular, the judge highlighted her unique experiences that jurors would not have—namely, prosecuting, defending, and presiding over other capital-murder cases.  She also pointed out to Garcia that, as the judge presiding over his case, she had participated in conversations with Garcia and his counsel and

14

had read attorney status reports that a jury would not be privy to. Instead of ruling on the motion that day, she advised Garcia to think about his decision overnight and to consult with his attorney.

**X.     Garcia pleads guilty and waives a jury for sentencing.**

¶35.   The next day, on January 18, 2017, Garcia pled guilty to the capital murder of JT. Garcia gave the factual basis for his plea. He claimed he went to the trailer that night with Gray, who had asked for his help. Inside, he found five-year-old JT already bound by socks to a chair, face down. Garcia proceeded to anally rape JT. After he ejaculated, he realized JT had "defecated everywhere." Garcia stated that he thought JT was dead at that point. Only later did he realize she was not dead, only unconscious. Because Garcia had not used a condom, he tried to clean her off. Both men carried her to the bathroom, and Garcia used the cap from a spray bottle to dip water from the toilet tank to rinse her. With Gray's help, Garcia hung JT from the neck using the socks that had bound her to the chair. Gray held JT while Garcia tied her to the shower window. Garcia then rinsed the backside of her body and flipped her around to wash her front. He left JT's body hanging in the trailer and went straight to the apartment's laundry room because his clothes were covered in fecal matter. Afterwards, he showered.

¶36.   The State then presented the proof it would offer at trial. Based on Garcia's admissions and the State's factual basis, the trial court accepted Garcia's guilty plea.

¶37.   Having waived his right to trial, Garcia proceeded to waive his right to a jury for sentencing. Garcia explained his decision:

15

Garcia:      Ma'am, I feel more comfortable having one individual, not 12, presiding over my sentencing. And I believe since you know me already and you can make that decision properly without any, you know, problems, ma'am.

Court:       Let me ask you this, Mr. Garcia. Do you think that if the proof is there that I would have any hesitation at all in imposing the death penalty?

Garcia:      No, ma'am.

Court:       Do you think if the proof is not there that I would have any hesitation at all in imposing life without parole?

Garcia:      Yes, ma'am, I understand.

Court:       So you think I would have some hesitation?

Garcia:      Oh, no, no, ma'am.

Court:       So you think—you don't, you're not hedging your bets here thinking I would lean one way or the other?

Garcia:      No, ma'am.

Court:       Okay. And you understand I will make that decision just like a jury would make it. It's just that the state, as I explained to you, would only have to convince me.

Garcia:      Yes, ma'am.

Court:       Not 12 people. All right?

Garcia:      Yes, ma'am, I understand.

Court:       All right. And so you believe that you've had sufficient time and sufficient advice to make this decision of your own free will?

Garcia:      Yes, ma'am.

¶38.    The judge then questioned Garcia's counsel to ensure Garcia had been given adequate time to consider his decision and had based his decision on the proper factors. Both of Garcia's lawyers answered that they and Dr. Storer had spoken at length with Garcia about what his decision would mean and that Garcia was sure that he wanted to waive a jury. After offering Garcia another opportunity to take more time to make his decision, which he declined, the trial court granted Garcia's motion to waive jury sentencing.

**XI.    The trial judge sentences Garcia to death.**

¶39.    The next week, the trial court held a three-day sentencing hearing.

¶40.    The State's presentation began with testimony from the 911 dispatcher who received the call from JT's mother that JT was missing. A recording of the 911 call was played for the judge. Next, the apartment manager testified. She testified Garcia had reported to her on the night JT disappeared that a little girl was missing. He was soaking wet, like he had just gotten out of the shower. He also appeared very calm. The next morning, after police found JT's body, Garcia returned to the manager's apartment. Garcia told her that he had been in that trailer and that police would likely find his prints and accuse him of the crime.

¶41.    Next, the State called Lieutenant Heather Dailey, who responded to the crime scene after JT's body had been found. She described the trailer as messy and dark, with items strewn everywhere. She explained that JT had a shirt on but was naked from the waist down. Crime Scene Technician Jessica Kendzioreck arrived at the trailer an hour later. Before moving JT's body, Kendzioreck took pictures of the trailer and JT's body as it was found. These pictures were admitted into evidence. FBI Agent Ty Breedlove searched the trailer

17

that day. He testified that, in his eight or nine years of experience, the trailer "was one of the most disgusting crime scenes that we've been to, full of cockroaches and rat feces and rotted food and the smell stuck with us for a good two or three weeks."

¶42. Police Officer Grant Koon attended the autopsy of JT's body, performed by the coroner the afternoon JT was found. Officer Koon testified he photographed the body. He also secured the samples taken from the body and submitted them to the FBI for testing. Shane Hoffman, the FBI forensic examiner who tested the samples also testified. He confirmed the DNA from the vaginal and anal swabs matched Garcia's DNA but excluded Gray's. The DNA on the socks tied to JT's neck also excluded Gray's DNA but was a possible, albeit inconclusive, match with Garcia's.

¶43. In addition to the DNA evidence, the State presented the recording of Garcia's conversation on the way to the police station. The State also played the recording of his interview once he arrived.[9]

¶44. The FBI digital forensic examiner also testified about the internet searches made through the seized Xbox. Search terms included "toddler hentai,"[10] "very young," "petit, tiny, tween, crying, rape, anal, forced," and "poor little thing, kidnapped and raped, virginravisher."

---

[9] At Garcia's request, the judge also admitted the recording of his second interview with the police, in which Garcia admitted helping Gray hang JT's body but denied sexually assaulting her.

[10] *See supra* n.5.

¶45.    Finally, the State called Dr. Mark LeVaughn, State Pathologist.  Dr. LeVaughn was admitted as an expert witness without objection from the defense.  He testified the appearance of JT's vagina and anus indicated injurious sexual penetration that would have caused JT pain and trauma.  Dr. LeVaughn gave his expert opinion that, based on the crime-scene photos, autopsy photos, and autopsy report, JT died from ligature strangulation or hanging.  He also testified that, based on his experience, the abrasions found on JT's neck below her left ear were scratch marks—marks typically left when someone tries to free herself from being hanged.

¶46.    Garcia called Dr. Storer to testify on Garcia's behalf.  Dr. Storer relayed that Garcia came from a broken home with too many children, a history of domestic violence, and some odd religious beliefs.  In particular, Garcia had been admitted to a child psychiatric hospital when he was eight years old.  From his records, it appears Garcia had been an "extremely disturbed child."  Upon his release, Garcia was supposed to be placed in a residential facility for treatment, but his mother did not follow through.  Garcia left school at sixteen and was, at one point, homeless.[11]  Dr. Storer also relayed Garcia's history with sexually compulsive behavior, including obsessive masturbation beginning at a prepubescent age.  He also experimented with bondage and sadomasochism beginning at the age of eighteen.  During one period, Garcia would go to pornographic theaters and allow random men to tie him up and have sex with him.

---

[11] Garcia later obtained his GED.

¶47.    Garcia also called Heather Hobby, Gray's ex-girlfriend and the source of the tip that led to the search of Gray's apartment.[12]   Hobby testified about Gray's relationship with Garcia—how Gray mistreated Garcia, how Garcia would do anything Gray wanted, and how Gray took advantage of that.

¶48.    In closing, Garcia's counsel condemned the death penalty generally and asked the judge for mercy.

¶49.    After deliberation, the trial judge sentenced Garcia to death.  The judge noted that, in her opinion, Garcia "had not been totally truthful" and had "never shown remorse."  The judge found, regardless of whether Gray was or was not involved, Garcia admitted he sexually assaulted and caused the death of JT, and he is responsible for those actions.

¶50.    The judge found two statutory aggravating circumstances beyond a reasonable doubt. First, beyond a reasonable doubt, the killing of JT occurred while Garcia was engaged in the commission of a sexual battery.  Miss. Code Ann. § 99-19-101(5)(d) (Rev. 2015).  Second, beyond a reasonable doubt, the capital murder of JT was especially heinous, atrocious, and cruel.  Miss. Code Ann. § 99-19-101(5)(i) (Rev. 2015).  The judge based her decision

> on evidence including the child's age, size, injuries, pain and suffering. [JT] was five (5) years of age, was four (4) feet two (2) inches tall, and weighed fifty (50) pounds. Garcia was a heavyset twenty-nine (29) year old man at the time of the crime. [JT] had no means by which she could have resisted Garcia or defended herself from his actions based on her size and age.  Further, she was face down, tied to a chair with her head stuffed into the seat and turned to the side. This occurred prior to the sexual assault even further restricting any ability to protect herself, avoid Garcia or avoid what was about to befall her.

---

[12] Hobby testified she called the police when she learned a little girl in Gray's apartment complex was missing because Hobby knew Gray "had a past with child pornography" and had been sexually abusive toward her.

Clearly she would have recognized and been aware of this occurring, that there was danger, and that something terrible was about to occur. Moreover, the assault and killing occurred in what is undisputedly a filthy trailer, with roaches running rampant everywhere and a terrible stench. [JT] was certainly able to see and know of these conditions before being bound to the chair.

She was then penetrated both vaginally and anally while still alive and tied to the chair. Garcia admits only to the anal penetration, which caused her to defecate. The undisputed evidence, however, is that his DNA was found to be a match to the DNA located on the vaginal swabs, with the person Garcia claims committed the vaginal penetration being excluded on DNA testing of those swabs. Garcia's DNA was also found to be a match to the DNA on the anal swabs, the rectum swabs, the inner thigh and vulva swabs, and the inside of the socks used to hang [JT]. The other person was also excluded from each DNA comparison.

There is every reason to believe that [JT] was conscious for at least some of the sexual assault. The length of time she was tied to the chair is not specified in this record, but was obviously long enough for both the vaginal assault and the anal assault. Garcia admits the anal penetration which, even accepting only his own testimony, had to follow the vaginal penetration. Dr. LeVaughn testified to the serious injuries inflicted to the vaginal and anal areas. Those injuries involved the entire circumference of each area as well as injuries to the internal portions of those areas. Dr. LeVaughn also testified that the sexual assaults would have caused [JT] pain and terror.

Finally, it is clear that death was not instantaneous upon the hanging. There is evidence that [JT] was conscious at some point during the hanging as there are scratches to her left face/jaw area which Dr. LeVaughn testified are consistent with someone attempting to free herself from a ligature around her neck. [JT] suffered significant physical and mental pain and suffering before her death. The sexual battery and killing of [JT] was brutal, cold and torturous.

¶51. The judge also found "some mitigating factors have been shown." Garcia had no significant criminal history. And he was twenty-nine years old at the time of the crime, "still being a considered young person." While Garcia claimed he committed the crime under extreme emotional disturbance, the judge found absolutely no evidence to support this alleged mitigating circumstance. Finally, Garcia presented evidence of his troubled

21

childhood and extensive information about the psychological evaluation performed by Dr. Storer. The judge noted that it appeared to be somewhat mitigating that his formative years "were far from good." Further, while Garcia no doubt had an anxiety disorder, this disorder had nothing to do with the crime committed. And while Garcia had ongoing mental-health issues as a child for which he did not receive treatment, at age twenty-nine, Garcia had long been old enough to seek help on his own.

¶52. In the end, the judge found the mitigating circumstances insufficient to outweigh the aggravating circumstances. She thereby sentenced Garcia to death. Following the denial of his motion to vacate the sentence and conduct a new sentencing trial, Garcia appealed his sentence only, having no right to appeal his underlying capital-murder conviction based on his guilty plea. *See* Miss. Code Ann. § 99-35-101 (Rev. 2015) ("[W]here the defendant enters a plea of guilty and is sentenced, then no appeal from the circuit court to the Supreme Court shall be allowed."). *But see* Miss. Code Ann. § 99-19-105(1) (Rev. 2015) ("Whenever the death penalty is imposed, and upon the judgment becoming final in the trial court, the sentence shall be reviewed on the record by the Mississippi Supreme Court.").

**Issues on Appeal**

¶53. On appeal, Garcia raises eight sentence-related issues:

1. Must Garcia's death sentence be set aside because the trial court unconstitutionally heard and decided material pretrial motions at a time when Garcia was incompetent to participate in the proceedings?

2. Was Garcia's waiver of a jury at his sentencing proceeding invalid because the trial court improperly denied his pretrial motion for change of venue?

22

3. Must Garcia's death sentence be set aside because the trial court relied on unconstitutionally admitted evidence to arrive at its sentencing decision?

4. Did the trial court reversibly err by finding Garcia competent to waive a jury trial at sentencing?

5. Was Garcia deprived of a fair sentencing tribunal because the sentencing judge should have disqualified herself based on her pre-sentencing exposure to confidential information that would ordinarily not be known to a sentencing factfinder, her admitted predisposition in this case, and her intent to consider extra-record matters?

6. Was Garcia's death sentence imposed in violation of the United States Constitution?

7. Must Garcia's death sentence be set aside as disproportionate?

8. Does the cumulative effect of the trial court's errors in this case mandate reversal of Garcia's death sentence?

Additionally, Mississippi Code Section 99-19-105(3) mandates this Court review Garcia's

death sentence and make the following determinations:

(a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;

(b) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101;

(c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; and

(d) Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error, or both.

23

Miss. Code Ann. § 99-19-105(3) (Rev. 2015).

<strong><u>Standard of Review</u></strong>

¶54.     "We apply heightened scrutiny to an appeal from a sentence of death." ***Evans v. State***, 226 So. 3d 1, 13 (Miss. 2017) (citing ***Corrothers v. State***, 148 So. 3d 278, 293 (Miss. 2014)). "This higher level of scrutiny requires that all doubts be resolved in favor of the accused because 'what may be harmless error in a case with less at stake becomes reversible error when the penalty is death.'" ***Bennett v. State***, 933 So. 2d 930, 939 (Miss. 2006) (quoting ***Balfour v. State***, 598 So. 2d 731, 739 (Miss. 1992)).

<strong><u>Discussion</u></strong>

## I.     COMPETENCY

### Issue 1:     Did the trial judge hear and rule on pretrial motions during a time when Garcia was incompetent?

¶55.     Garcia first argues his sentence must be vacated because the trial court "unconstitutionally heard and decided pretrial motions material to the sentencing proceedings under review at a time when Garcia was incompetent to participate in the proceedings." Garcia claims the record "establishes without dispute" that, due to his untreated anxiety disorder, Garcia was incompetent to participate in open-court proceedings from the time of his arraignment in October 2015 until, following treatment, he was found to be competent on January 12, 2017. Garcia argues that during this time, despite his incompetency, the trial court ruled on motions significant to his sentencing, such as his motion to change venue and his motions to suppress. Citing ***Drope v. Missouri***, 420 U.S. 162, 181, 95 S. Ct. 896, 43 L.

24

Ed. 2d 103 (1975), Garcia argues that, because the proceedings against him were not suspended during the time of his incompetency, his sentence must be set aside.

¶56.   Garcia's argument principally rests on his presumption that the trial court "adjudicated that Garcia was not competent" at the November 22, 2016 hearing and only found Garcia to be competent on January 12, 2017, after Garcia received "restorative treatment." Consequently, Garcia insists, the trial court held important pretrial hearings and made rulings during a time Garcia had been found incompetent.  But the record does not support this premise.  Instead, the record shows the opposite—the trial court found Garcia to be competent during the entire trial-court proceedings.

¶57.   "The standard for competency to stand trial is whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding,' and 'has a rational as well as a factual understanding of the proceedings against him.'" *Pitchford v. State*, 240 So. 3d 1061, 1067 (Miss. 2017) (quoting *Gammage v. State*, 510 So. 2d 802, 803 (Miss. 1987)); *see also* *Dusky v. United States*, 362 U.S. 402, 402, 80 S. Ct. 78, 4 L. Ed. 2d 824 (1960) (per curiam).  And at the November 2016 hearing, following Dr. Storer's testimony, the trial judge found Garcia met this standard.  She ruled, "based on the testimony, and of course [her] observances of Mr. Garcia, it [did] not appear to [her] that he is in any manner incompetent in terms of intellectual functioning or his ability to understand and appreciate what is going on or in fact in his ability to consult with his attorneys."

¶58.   The judge did, however, "have some question" about how Garcia would handle the courtroom setting *if the case went to trial*.  Noting how Garcia appeared more relaxed when

25

properly medicated, she determined, "the better course [was] to try to treat [his anxiety] first and see where [things stood] in about thirty days." At that point, the judge found Garcia "competent but for that *potential* issue . . . ." (Emphasis added.) On appeal, Garcia interprets the judge's ruling as finding him *incompetent* to participate in open-court proceedings and actually communicate with his lawyers during them. But this interpretation is contrary to what the judge actually found. As part of her ruling, the judge noted, "It appear[ed] to [her] that clearly [Garcia] could participate during trial." At the time of the November 2016 hearing, the judge determined Garcia "probably could make it through a trial, and . . . probably would do all right going through a trial." But because "it would take a great deal of patience on his part and his attorney's part," and to prevent Garcia's anxiety from *potentially* escalating to a point that he could not participate at future trial, the judge ordered treatment and a reevaluation in thirty days.

¶59.    Garcia's interpretation is further contradicted by the judge's comments on her prior ruling at the December 20, 2016 omnibus hearing. Notably, defense counsel never objected to this hearing based on Garcia's incompetency. And when discussing the issue of competency, the judge asked Garcia's counsel, "[A]t this point, . . . there's no claim of incompetency to stand trial but for this anxiety issue we've already addressed, and *that's not really a competency issue so much as a being able to pay attention and participate*, right?" (Emphasis added.) And counsel acknowledged, "That's correct[.]"

¶60.    At the January 12, 2017 hearing, in which the trial court "follow[ed] up on Dr. Storer's earlier testimony concerning the anxiety issue," the judge emphasized that she never

26

found Garcia to be incompetent. Instead, "clearly the court previously found that Mr. Garcia was competent with regard to his mental functioning, his intellectual abilities, et cetera." But the judge did note "there was some concern with not purely competence, but his ability to be in the courtroom and to fully participate in his defense, to communicate with his counsel, if he choose[s] to do so, to be able to testify." Garcia seizes on this comment, asserting that competency includes the ability "to rationally communicate with his attorney about the case" and "to testify in his own defense if appropriate." *Hearn v. State*, 3 So. 3d 722, 728 (Miss. 2008) (quoting *Martin v. State*, 871 So. 2d 693, 697 (Miss. 2004)). But the judge never found Garcia had met his burden to overcome the presumption that he possessed these abilities. *See Evans*, 226 So. 3d at 14 ("The burden of proof rests on the defendant to prove that he is mentally incompetent to stand trial." (citing *Richardson v. State*, 767 So. 2d 195, 203 (Miss. 2000))). Rather, the record shows the judge was concerned about—and addressed—the possibility that Garcia might lose these abilities during a future jury trial if he was not properly medicated.

¶61. Specifically, the trial court never found what Garcia now asserts on appeal—that, from the time of his arraignment in October 2015 until Dr. Storer testified a second time in January 2017, Garcia had been incompetent to participate in the proceedings that took place during that time period.

¶62. As to the trial court's actual finding—that Garcia was competent during the entire trial-court proceedings—we find no abuse of discretion. *See Martin*, 871 So. 2d at 698 (applying abuse-of-discretion standard of review to a competency determination). "We will

27

reverse a trial court's competency determination only if it is 'manifestly against the overwhelming weight of the evidence.'" ***Dickerson v. State***, 175 So. 3d 8, 15 (Miss. 2015) (quoting ***Hearn***, 3 So. 3d at 728). And here, contrary to Garcia's claim, the trial court's finding Garcia to be competent was not manifestly against the overwhelming weight of the evidence.

¶63. At the November 2016 hearing, Dr. Storer did testify that his preliminary opinion was that Garcia was incompetent. But this testimony did not go "unrebutted" as Garcia suggests. Instead, the trial judge questioned Dr. Storer carefully about the bases of his opinion, one being the reported panic attack Garcia suffered during the July 26, 2016 suppression and change-of-venue hearing. The judge asked Dr. Storer if he was aware that Garcia exhibited no symptoms during the court proceeding that morning. Instead, he reported to his attorneys as they were breaking for lunch that he did not feel well. It came to light that Garcia had not been given his medication that morning, so the jail nurse was called to see Garcia during the break. After being seen and treated, Garcia told the court he felt better.

¶64. Dr. Storer had also based his opinion on Garcia's initial stated preference for the death penalty over life without parole. Dr. Storer had testified he was concerned Garcia's preference was evidence his anxiety disorder had impaired his decision-making ability. But when questioned by the trial judge, Dr. Storer admitted this was only a concern. He could not say that Garcia's anxiety impaired his rational decision-making ability to a reasonable degree of psychological certainty.

¶65.    The judge also asked Dr. Storer about his comment that Garcia had responded appropriately to the questions posed by the court and that Garcia fully understood what was going on.  Dr. Storer reiterated that Garcia's intellectual functioning was fine and that his anxiety disorder "is not a severe and persistent mental illness of the type that would alter someone's perception of reality."  Instead, Dr. Storer testified that Garcia's anxiety "shuts him down to where he's not paying attention and listening and processing information, and he's not able to ask questions of his attorneys as appropriate or point things out."  But balanced against Dr. Storer's opinion was the trial judge's own observations of Garcia in court and her own careful questioning of Garcia at each hearing to ensure he understood what was going and had a meaningful opportunity to communicate with his counsel.  We have carefully reviewed these proceedings and find no evidence Garcia had been unable to understand what was going on or consult with his counsel.

¶66.    In other words, the transcript belies Garcia's assertion that "without dispute" he was actually incompetent during his change-of-venue and evidence-suppression hearings. Criminal defendants—including those charge with capital offenses—are presumed competent, with "[t]he burden of proof rest[ing] on the defendant to prove that he is mentally incompetent to stand trial." *Evans*, 226 So. 3d at 14 (citing ***Richardson***, 767 So. 2d at 203). Here, contrary to Garcia's assertion, the trial court never found Garcia had met that burden. And the record does not show her finding Garcia competent was manifest error.  Therefore, the trial court did not reversibly err by failing *sua sponte* to suspend the proceedings against

29

Garcia from his arraignment until Dr. Storer submitted on January 12, 2016, his final report finding Garcia competent.

**Issue 4:** **Did the trial judge err by finding Garcia competent to waive a jury for sentencing?**

¶67. Garcia raises a second competency argument related specifically to his competency to waive his right to a jury trial at sentencing. Despite his own mental-health expert's testifying on January 12, 2016, that Garcia was competent, Garcia now argues the trial court erred by finding him competent to waive his right to jury sentencing.

¶68. Garcia seemingly dismisses Dr. Storer's finding of competency because it was conditioned on Garcia's receiving proper medical treatment. But at no point does he argue that he had been incompetent on January 18, 2017—the day he waived his right to a jury for sentencing—because he had not received proper medication. Garcia also contends the trial court erred by largely rejecting Dr. Storer's testimony at the November 16, 2016 hearing that Garcia's anxiety disorder impaired his ability to make rational decisions, as evidenced by his stated preference to live on death row instead of with the general prison population. While acknowledging his preference changed following treatment,[13] Garcia attributed this change to continued availability of treatment. But Garcia does not claim lack of proper treatment contributed to his decision to waive jury sentencing.

---

[13] Garcia fails to acknowledge, however, that Dr. Storer could not testify to a reasonable degree of psychological certainty that Garcia's anxiety disorder impaired his rational decision-making ability. Rather, Dr. Storer was merely concerned, which was largely the reason he suggested treatment.

¶69. Instead, citing the Mississippi Court of Appeals' decision in *Magee v. State*, 752 So. 2d 1100, 1102 (Miss. Ct. App. 1999), Garcia argues—in his own words—that the "capacity for rational decision making" is "another aspect of competency."[14] He contends his decision to waive a jury for sentencing was irrational because his "sole concern" was avoiding the jury-selection process. As support, he zeroes in on one question he asked during the hearing:

Garcia:     Just one question, ma'am. If I waiver [sic] my sentencing Jury, would a Jury still be selected?

Judge:     No.

Garcia:     Okay. That's why I was asking.

Garcia claims on appeal that this question "is that of a person who is so controlled by his fear of having an anxiety attack if his medications fail him in a courtroom full of people during the jury selection process that he is driven by his mental illness to do anything to avoid the possibility that could happen." But even under heightened scrutiny, and giving Garcia the benefit of any doubt, the record does not support his contention that the trial court erred by

---

[14] Here is what the Court of Appeals actually held in *Magee*:

The standard of competency to enter a guilty plea is the same as that for determining competency to stand trial. *Godinez v. Moran*, 509 U.S. 389, 399, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993); *Caylor v. State*, 437 So. 2d 444, 447 (Miss. 1983). All that the State must demonstrate as to competency to stand trial is that the defendant has a rational understanding of the charges against him and the ability to assist his lawyer in preparing his defense. *Godinez*, 509 U.S. at 396 . . . ; *Caylor*, 437 So. 2d at 447.

*Magee*, 752 So. 2d at 1102. In other words, the standard for competency to waive the right to a jury trial is the same standard of competency to stand trial. It is the *Dusky* standard—the "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402.

finding him competent. Garcia bore the burden to show incompetency by a preponderance of the evidence. ***Ross v. State***, 954 So. 2d 968, 1007 (Miss. 2007) ("Where there is a serious question about the sanity or competency of a defendant to stand trial, 'it naturally devolves upon the defendant to go forward with the evidence to show his probable incapacity to make a rational defense.'" (quoting ***Emanuel v. State***, 412 So. 2d 1187, 1189 (Miss. 1982))). And, here, Garcia's isolated procedural question does not tip the scale against the trial judge's ruling.

¶70.    Instead, the trial judge's finding that Garcia was competent is supported not only by her own observations of Garcia's ability to communicate with counsel and participate in the proceedings against him over the course of more than a year but also by Garcia's own expert. Indeed, Dr. Storer found Garcia competent after interviewing him in a courtroom in front of his entire defense team and a dozen officers convened to simulate as closely as possible a jury-trial environment. Dr. Storer created this environment to ensure Garcia's social-anxiety issues did not factor in his decision to waive his right to a jury sentencing.

¶71.    After review, we find the judge's competency finding well supported. There is no reversible error on either competency-related claim.

## II.    CHANGE OF VENUE

**Issue 2:        Did the trial court abuse its discretion by denying Garcia's motion to change venue?**

¶72.    As his second issue, Garcia argues that his waiver of a jury at sentencing was invalid because the trial court improperly denied his pretrial motion for a change of venue. Garcia argues he waived his right to a sentencing jury out of necessity because the trial judge ruled

32

his jury would come from Harrison County, "a place where there was personal hatred against him."

¶73. The record, however, does not support that his waiver of a sentencing jury was forced or even connected to the denial of his motion to change venue months earlier. In the December 2016 pretrial conference, the trial judge indicated her motion-to-change-venue decision was not set in stone. Garcia was free to raise the venue issue again based on changing circumstances. Garcia did not renew his motion—despite now arguing on appeal that post-venue-hearing circumstances supported the need to change venue. Instead, Garcia chose to waive his right to a jury at sentencing.

¶74. Further, before accepting Garcia's waiver of a jury at sentencing, the trial judge specifically advised Garcia that he would be waiving his right to challenge her jury-related pretrial rulings, including the denial of his motion to change venue. She warned, "You're giving up the right, all these motions we've heard about the venire and possible media coverage, all of that stuff, basically all those motions would go by the wayside as to any kind of fair and impartial jury. You understand that?" Garcia responded that he understood.

¶75. On appeal, Garcia argues the trial judge's advice contained legal error. Citing cases from other jurisdictions, he argues that his waiver of a jury at sentencing did not operate as a waiver of the right to challenge on appeal the denial of his motion to change venue. *State v. Kahey*, 436 So. 2d 475, 481 (La. 1983) (holding that the waiver of trial by jury did not moot the change-of-venue issue); *State v. Johnson*, 318 N.W.2d 417, 421 (Iowa 1982) (same); *Commonwealth v. Dobrolenski*, 334 A.2d 268, 271 (Pa. 1975) (same).

¶76. In their briefs, both Garcia and the State claim ***Byrom v. State***, 863 So. 2d 836, 851 (Miss. 2003), speaks to the waiver issue. But in ***Byrom***, also a death-penalty case, the defendant did not plead guilty, as Garcia did, but instead was tried by a jury. Only after a jury found her guilty did the defendant waive her right to a jury at sentencing. ***Id.*** at 845. On appeal of both the jury's verdict and the trial court's sentence, Byrom argued the trial court erred by denying her motion to change venue. ***Id.*** at 851. But it came to light that Byrom's counsel erroneously believed a motion to change venue had been denied, though in reality the motion, while discussed in open court, had never been filed. ***Id.*** Because no motion was ever filed or brought to a hearing, this Court found the issue of venue procedurally barred. ***Id.*** We also found her claim lacked merit. ***Id.***

¶77. ***Byrom*** was based on a waiver principle not at issue here—the failure to obtain a ruling on a motion. ***Id.*** Here, Garcia obtained a ruling. His motion to change venue was denied. But he then proceeded to waive his right to a jury both at trial and at sentencing. So ***Byrom*** is silent on what impact Garcia's waiver of a jury had on his ability to appeal the denial of his motion to change venue.

¶78. We do note the Mississippi Court of Appeals has addressed this issue in a non-death-penalty case. In ***Grissom v. State***, 66 So. 3d 1280, 1282 (Miss. Ct. App. 2011), the court held that the defendant was procedurally barred from raising in a motion for postconviction relief the claim that the trial court erred by denying his motion to change venue. The bar applied because the defendant "chose to plead guilty and, thus, did not have a trial." ***Id.*** We find the Court of Appeals' reasoning sound. Because Garcia chose to plead guilty, waiving his right

34

to a jury trial, and because Garcia additionally waived his right to a jury at sentencing instead of renewing his motion to change venue, we find this issue is procedurally barred.

¶79.    That said, in **Byrom**, we proceeded to address the merits of the capital defendant's venue claim despite the clear procedural bar. **Byrom**, 863 So. 2d at 851. We do the same here, additionally finding the trial judge did not abuse her discretion by denying Garcia's motion to change venue.

¶80.    "A motion for a change of venue is not automatically granted in a capital case." **Id.** Even in a capital case, "[t]he decision to grant a change of venue rests soundly in the discretion of the trial judge." **King v. State**, 960 So. 2d 413, 429 (Miss. 2007) (citing **Howell v. State**, 860 So. 2d 704, 718 (Miss. 2004)). "This Court will not disturb the ruling of the trial court where the sound discretion of the trial judge in denying a change of venue was not abused." **Id.** (citing **Howell**, 860 So. 2d at 718).

¶81.    As required by Mississippi Code Section 99-15-35, Garcia's motion to change venue contained three sworn affidavits by Harrison County citizens that Garcia could not receive a fair and impartial trial. He also attached copies of media reports. At the change-of-venue hearing, the State acknowledged Garcia's motion complied with Section 99-15-35, creating "a presumption . . . that an impartial jury is unattainable." **Barfield v. State**, 22 So. 3d 1175, 1183 (Miss. 2009) (citing **Welde v. State**, 3 So. 3d 113, 118 (Miss. 2009); Miss. Code § 99-15-35 (Rev. 2007)); *see also* **Holland v. State**, 705 So. 2d 307, 336 (Miss. 1997) ("In addition [to affidavits], adverse and prejudicial pretrial publicity may demonstrate the

inability to obtain a fair jury in that venue." (citing ***Johnson v. State***, 476 So. 2d 1195, 1211 (Miss. 1985))).

¶82.    But this presumption is rebuttable. ***Johnson***, 476 So. 2d at 1211. To that end, the trial court proposed and Garcia and the State agreed to putting the pretrial-publicity question to a jury venire that had been summoned but not chosen for another trial. *See **id.*** (acknowledging that the State may rebut the presumption by demonstrating through voir dire that an impartial jury is attainable); *see also **Welde***, 3 So. 3d at 118 ("The State may rebut the presumption that an impartial jury cannot be obtained 'by proving from voir dire that the trial court impaneled an impartial jury.'" (quoting ***Holland***, 705 So. 2d at 336)). So on August 16, 2016, the trial judge, the State, and Garcia questioned a pool of thirty potential jurors summoned for an unrelated trial but not selected to serve on the jury. Of the thirty, nineteen acknowledged having known, heard, or read something about Garcia's case. After general questions were asked, fourteen mock jurors were asked to stay for additional detailed questions.

¶83.    In making her ruling, the trial court found the "questioning of the jurors in this matter to be the most helpful to the determination of this Motion [to change venue]." Specifically,

> There were over one-third of the total jurors who indicated that they had never heard or seen anything concerning this case. Of those fourteen (14) questioned more fully, half had no knowledge of the case. Only three (3) of the fourteen (14) questioned in detail indicated having formed any opinion and only two (2) of those three (3) indicated that they would not be able to set that opinion aside. In fact, one (1) of those two (2) would not have been a proper juror for any case. After being told about the burden of proof being on the State and upon being asked in general if the State proved in any case that a crime had been committed but failed to prove that a defendant had committed it whether the jurors would find that defendant not guilty, this particular juror indicated

36

that he would not as he believed that if someone was present or knew about the crime or such, then that person was also guilty.

The trial judge concluded that "the questioning of the jurors indicates to the Court that the publicity has not been so pervasive that everyone has either become exposed to it or recalls it. It also indicates that a fair and impartial jury can be seated, given proper and thorough voir dire." We find no abuse of discretion in this finding. As in **Welde**, only one person answered he could not apply the presumption of innocence. *See **Welde***, 3 So. 3d at 119 (affirming the trial court's denial of a motion to change venue partly because "[o]nly one prospective juror stated that he had formed a fixed opinion").

¶84. Garcia argues the trial judge should have never conducted a voir dire because his motion demonstrated that the presumption he could not receive a fair trial in Harrison County due to the media coverage was irrebuttable. "While the presumption may be rebutted during voir dire," this Court has found that "'in some circumstances pretrial publicity can be so damaging and the presumption so great, that no voir dire can rebut it.'" **White**, 495 So. 2d at 1349 (quoting **Johnson**, 476 So. 2d at 1211). This Court "ha[s] set forth certain elements which, when present would serve as an indicator to the trial court as to when the presumption is irrebuttable." **Id.** These elements are

(1) Capital cases based on considerations of a heightened standard of review;

(2) Crowds threatening violence toward the accused;

(3) An inordinate amount of media coverage, particularly in cases of

(a) serious crimes against influential families;

(b) serious crimes against public officials;

37

(c) serial crimes;

(d) crimes committed by a black defendant upon a white victim;

(e) where there is an inexperienced trial counsel.

*Id.* In her order denying Garcia's motion to change venue, the trial judge considered each these factors. She acknowledged the fact Garcia's case was capital. But she found a lack of evidence of threats of violence on Garcia. Further, she determined there had not been "an inordinate amount" of media coverage.

¶85. In particular regarding media coverage, the trial judge acknowledged that "[t]here was a great deal of coverage at the time of the subject crime, arrest of [Garcia,] and preliminary hearing." But then the coverage severely dropped off. "There were then a few articles the following year and only one (1) this year prior to the hearing on this Motion." Moreover, while "[t]he subject crime is certainly serious, . . . there is no allegation that it was committed against a member of an influential family or a public official. Nor is there any indication that it is a serial crime. The victim was black and the Defendant is Hispanic." Finally, the trial judge noted that Garcia's "[t]rial counsel is experienced." For these reasons, the trial judge concluded the media coverage had not been "an inordinate amount." Specifically, she found the coverage had not reached the saturation level found to create an irrebuttable presumption of partiality in *Fisher v. State*, 481 So. 2d 203, 217-23 (Miss. 1985).[15]

---

[15] The trial judge here found,

This is particularly true when one considers that there were approximately thirteen (13) homicides in Harrison County in 2014, seven (7) of those being in Gulfport (including the subject crime). Each of those homicides also received a great deal of media coverage at the time of the occurrence, the

38

¶86. On appeal, Garcia is dismissive of the trial judge's findings both that there was a lack of evidence of threats of violence made toward Garcia and that there had not been "an inordinate amount" of media coverage. He asserts that "throughout the process[,] threats of violence toward the accused from the community, and indeed toward his counsel, have been present and ubiquitous."[16] He cites various articles as demonstrating a community demand for his death.[17] But as evidenced by the record, the trial judge carefully considered each article Garcia submitted.[18] And from these articles she detected no present and ubiquitous

---

arrest and the preliminary hearing. That is, this case was neither the only homicide in 2014, nor the only homicide receiving media coverage. To be sure, the fact that the victim in this case is a child separated it somewhat from other homicides and did draw attention from those outside of this geographic area. However, there has certainly not been the media saturation which occurred in *Fisher*. Nor has there been any indication of any prior convictions of Defendant or any indication that he has ever been involved in any similar crime as also occurred in *Fisher*.

[16] We note that counsel's comment about receiving threats was made at sentencing, not at the motion to change venue. And Garcia never renewed his motion to change venue based on any new evidence, despite being advised that he could.

[17] At oral argument, Garcia's counsel also repeatedly referenced a petition calling for Garcia to be sentenced to death. But Garcia's counsel admitted this undated petition had been filed *after* Garcia pled guilty. And even so, Garcia did not renew his motion to change venue. Instead, he proceeded to waive a jury at sentencing.

[18] In her order, the trial judge observed,

[Garcia] also submitted a large number of media reports. The Court has reviewed each of those. Only one (1) article for 2016 was submitted and that article followed an earlier motion hearing in this case. Eight (8) articles from 2015 were submitted. Three (3) of those focused on the one (1) year anniversary of the date of the subject crime; one (1) related to the victim's seventh birthday; two (2) reported on [Garcia's] arraignment; one (1) reported on the setting of the trial date in this cause; one (1) reported on the victim's cousin beginning a group to help victim's families; and one (1) related to a

threats of violence. Only one article reported the jail warden's saying Garcia had not been housed with the general population due to the high probability of threats against inmates accused of sex crimes against children and internal and external threats. And this one article, standing alone, is insufficient to show the trial judge abused her discretion.

¶87. This Court has also carefully reviewed the media reports submitted to the trial court. And despite Garcia's characterizations, the remaining articles do not demonstrate the threat of community violence was such that no voir dire could rebut the presumption of impartiality. Nor do they, as Garcia also argues on appeal, demonstrate a saturation of media coverage such that the denial of his motion to change venue was reversible error. Even under the heightened scrutiny of a capital case, the trial judge did not abuse her discretion when she evaluated the *White* factors and concluded the media coverage was not such that the presumption a Harrison County jury could not be impartial was irrebuttable.

---

second arrest of a person of interest in this cause who has not been charged with the crime in this cause.

The majority of the articles are from July and August of 2014, just after the subject crime occurred. The initial articles concern the victim's disappearance and make no mention of [Garcia] who had not yet even been identified as a person of interest. Later articles report on [Garcia's] arrest, the cause of death, and [Garcia's] preliminary hearing. The later articles in 2014 contain a number of details as to cause of death, [Garcia's] purported statements, and DNA testing.

Many of the articles are the same, simply having been published by different media sources. A number of articles also report on the fact that [Garcia] was first arrested and charged with burglary of the trailer in which the victim was found and his purported statement admitting to that burglary. Many of the details in the articles appear to have come from the testimony adduced at the preliminary hearing in this case.

40

¶88. Because the State rebutted the presumption of unfairness through the agreed-upon mock voir dire—demonstrating an impartial jury could be drawn from Harrison County[19]— the trial judge did not abuse her discretion by denying Garcia's motion to change venue. *See Welde*, 3 So. 3d at 119.

## III. EVIDENCE

**Issue 3:** **Did the trial court rely on "unconstitutionally admitted evidence" when making its sentencing decision?**

¶89. As his third claimed error, Garcia argues the trial judge relied on "unconstitutionally admitted evidence" when making her sentencing decision. Specifically, he challenges the admission of the Xbox internet searches and his statements to the police, which he tried to suppress pretrial. He also challenges the admission of the State pathologist's expert testimony, to which he never objected. "The admission of evidence . . . is left to the sound discretion of the trial judge." *Havard v. State*, 928 So. 2d 771, 797 (Miss. 2006) (quoting *Minor v. State*, 831 So. 2d 1116, 1120 (Miss. 2002)). After review, we find the trial judge did not abuse her discretion by admitting these three categories of evidence.

### A. *Internet Searches on Garcia's Xbox 360*

¶90. Garcia first argues the trial judge erred by denying his motion in limine to exclude evidence of the internet searches conducted through his Xbox 360. At the motion hearing,

---

[19] At oral argument, Garcia's counsel insinuated that, because the jurors who had been questioned knew they would not in fact have to serve on a death-penalty case, their answers may not have been truthful. But this newly raised speculation ignores that Garcia's lawyers agreed to this approach. And it cuts both ways because the opposite could be just as easily argued—that these fourteen people's answers were more truthful because none had incentive to lie to escape jury service for a lengthy capital-murder trial for which they may have been sequestered.

an FBI forensic examiner testified these searches—which were of a sexually explicit and violent nature and involved terms describing young females—had originated from the Xbox seized from Garcia's bedroom and had been conducted in the week before JT's murder. Garcia objected to the admission of the searches based on Mississippi Rule of Evidence 901, which requires evidence be authenticated before admission. He also objected, citing Mississippi Rule of Evidence 403. This rule grants trial courts discretion to exclude otherwise admissible evidence if its probative value is outweighed by the danger of unfair prejudice.

¶91. In claiming the searches had not been properly authenticated under Rule 901, Garcia likened this evidence to the social-media messages purportedly sent by the defendant in *Smith v. State*, 136 So. 3d 424 (Miss. 2014). In *Smith*, this Court ruled the messages were not properly authenticated as being what they purported to be—messages created and sent by the defendant. The primary concern in *Smith* was the potential for fabrication—that is, creating a fake social-media account using someone else's name and masquerading as that person. *Id.* at 432-33. "Because of the special concerns regarding fabrication," we ruled that "'the fact that an electronic communication on its face purports to originate from a certain person's social networking account is generally insufficient standing alone to authenticate that person as the author of the communications.'" *Id.* at 433 (quoting *Campbell v. State*, 382 S.W.3d 545, 550 (Tex. Ct. App. 2012)).

¶92. Here, by contrast, we are not dealing with an electronic communication purporting to originate from Garcia's social-media account. We are dealing with electronic searches

indisputably conducted on Garcia's electronic device. And when it comes to the authentication of internet searches, courts have found that evidence that searches were conducted on the defendant's device is sufficient to make a prima facie case of authentication. *Saunders v. State*, 241 So. 3d 645, 648-49 (Miss. Ct. App. 2018) (holding that the screen shot of a text message found on a phone in the defendant's possession met a prima facie showing of authenticity); *see also Hoey v. State*, 519 S.W.3d 745, 757-58 (Ark. Ct. App. 2017) (holding that testimony that internet searches came from two smart phones found in the defendant's possession was sufficient to authenticate them); *Holzheuser v. State*, 828 S.E.2d 664, 668-69 (Ga. Ct. App. 2019) (holding that images and notes found on the defendant's personal cell phone were sufficiently authenticated); *United States v. Lubich*, 72 M.J. 170, 175 (C.A.A.F. 2013) (holding that a prima facie showing of authenticity had been made by evidence that incriminating internet searches were made using defendant's account). Indeed, in *Smith*, this Court surmised that a social-media message potentially could be authenticated by evidence "that the communication originated from the purported sender's personal computer . . . ." *Smith*, 136 So. 3d at 433.

¶93. As the trial judge ruled, the possibility that some of the searches on the Xbox could have been conducted by someone else besides Garcia goes to the *weight* of this evidence, not its authenticity.[20] *See Holzheuser*, 828 S.E.2d at 668 ("To the extent that Holzheuser argues that the information on his phone could have been the product of a different person's use of

---

[20] At his guilty-plea hearing, Garcia admitted making some of the searches, but he claimed he accidentally typed "tween" instead of "teen." Other searches he suggested were made by Gray, who Garcia claimed had borrowed his Xbox that week.

his phone without his knowledge or permission, this argument goes to weight, not authenticity."); *McLemore v. State*, No. 02-15-00229-CR, 2016 WL 4395778 (Tex. Ct. App. Aug. 18, 2016) ("The possibilities that someone accessed the data before appellant owned the phone or while he owned it but was not in possession of it are alternative scenarios that the jury was entitled to assess upon the admission of the evidence."); *Lubich*, 72 M.J. at 175 (noting that, once Rule 901's standard had been met, the defendant had the opportunity to cross-examine the government expert on "the possibility that someone else was sitting at a computer that [the defendant] previously logged onto and entered the information without her knowledge").

¶94.    As this Court has said, "A party need only make a prima facie showing of authenticity, not a full argument on admissibility.  Once a prima facie case is made, the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court." *Walters v. State*, 206 So. 3d 524, 535 (Miss. 2016) (quoting *Sewell v. State*, 721 So. 2d 129, 140 (Miss. 1998)).  In other words, the State was "not required to rule out all possibilities inconsistent with authenticity." *Jones v. State*, 466 S.W.3d 252, 262 (Tex. Ct. App. 2015).

¶95.    The State made a prima facie showing that the internet searches were what the State claimed them to be—internet searches made on Garcia's Xbox.  The State was not required to rule out the possibility that the internet searches could have been conducted by someone other than Garcia.  Therefore, the trial judge did not abuse her discretion by finding this evidence had been sufficiently authenticated.

44

¶96. Turning to Rule 403, the trial judge did not abuse her discretion by finding the probative value of the searches was not outweighed by any unfair prejudice. *See* M.R.E. 403. While Garcia tries to discount the probative value—namely through his denial he was the one who made the searches—the probative value was certainly high. The searches were for child pornography that mimicked the acts Garcia admitted carrying out. And the searches were made just days before Garcia acted. So any claim of unfair prejudice is unfounded under this highly discretionary rule.

¶97. Also unfounded is Garcia's claim, raised for the first time on appeal, that the trial judge should have excluded the searches based on Mississippi Rule of Evidence 404(b)(1), which deems "[e]vidence of a crime, wrong, or other act . . . not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." M.R.E. 404(b)(1). Not only may the Xbox evidence be considered intrinsic to the charged sexual-battery-based murder, but what Garcia is now calling inadmissible character evidence falls well within obviously applicable exceptions to Rule 404(b)(1), found in Rule 404(b)(2). Under 404(b)(2), "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." M.R.E. 404(b)(2). The internet searches certainly go to the issues of motive, intent, preparation, and plan.

### B. Garcia's Voluntary Statement to Police

¶98. Next, Garcia argues the trial judge violated his Fourth, Fifth, Sixth, and Fourteenth Amendment rights when she denied his motion to suppress his statements to the police and

their fruits. Garcia argues that the first recorded conversation in the police car with Detective Fulks violated his *Miranda* rights. *See Miranda*, 384 U.S. at 444. He further reasons that information from the car conversation was used to gather more information in the formal police interview, before which he was advised of and waived his *Miranda* rights. And it was his admissions during the police interview that formed the probable-cause basis for the search warrant of his apartment. Therefore, he concludes, both statements and the evidence from his apartment should have been suppressed. *See Marshall*, 584 So. 2d at 438 (explaining that the "fruit of the poisonous tree"—or exclusionary rule—"prohibits the introduction of *derivative evidence*" that is the product of evidence obtained in violation of the Fourth Amendment (quoting *Murray*, 487 U.S. at 536)).

¶99. But, as the trial court found, for *Miranda* rights to attach, Garcia had to have been "in custody" while on his way to the police station. *Hopkins v. State*, 799 So. 2d 874, 878 (Miss. 2001) (citing *Miranda*, 384 U.S. at 444; *Oregon v. Mathiason*, 429 U.S. 492, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977); *Moore v. State*, 344 So. 2d 731 (Miss. 1977)). "The test for whether a person is in custody is whether a reasonable person would feel he was in custody and depends upon the totality of the circumstances," and

> [t]he factors to be considered include the place and time of the interrogation, the people present, the amount of force or physical restraint used by the officers, the length and form of the questions, whether the defendant comes to the authorities voluntarily, and what the defendant is told about the situation.

*Id.* (citing *Hunt v. State*, 687 So. 2d 1154, 1160 (Miss. 1996); *Porter v. State*, 616 So. 2d 899, 907 (Miss. 1993)). Commander Brown testified Garcia approached him voluntarily during the search of Gray's apartment. Detective Fulks then testified Garcia voluntarily

46

agreed to accompany Fulks—who at the time was a patrol officer—to the police station to speak with detectives. When Garcia got into the back of the police car, he was not restrained. He was free to leave and could have asked Detective Fulks to pull over or turn around at any point. Garcia was not delivered to the sally port like other suspects, and he was not interrogated. Having watched the video of the car ride, the trial court noted it was Garcia who initiated the conversation and any questions Detective Fulks asked dealt with a general conversation between the two—they were not investigatory. So the evidence supports the trial court's determination that Garcia was not in custody.

¶100. On appeal, Garcia does not contend he was in custody when he voluntarily got into the police car. Rather, he suggests that, as soon as he mentioned he had rummaged through the trailer days before, Detective Fulks should have *Mirandized* him. But Detective Fulks testified that, during the car ride, he had no reason to suspect Garcia had committed a separate crime of burglary based on his statement about his fingerprints. At that point, Detective Fulks was simply giving a witness a ride to the police station as part of the ongoing investigation of JT's murder.

¶101. Garcia's claim that the car ride somehow turned into a custodial investigation of his burglary of the trailer has no basis. As the United States Supreme Court explained in *Miranda*, "Our decision is not intended to hamper the traditional function of police officers in investigating crime. . . . General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding." *Miranda*, 384 U.S. at 477 (citation omitted). Garcia's statement was made while

47

a patrol officer voluntarily transported him to the police station as part of the fact-finding process. He was not in custody. Therefore, the trial court did not err by denying his motion to suppress the video of the car ride and its fruits.

### C.    The State Pathologist's Expert Testimony

¶102. Finally, Garcia argues for the first time on appeal that Dr. LeVaughn's testimony about JT's cause of death violated his constitutional right to confront his accuser. *See* U.S. Const. amend VI. Relying on ***Bullcoming v. New Mexico***, 564 U.S. 647, 652, 131 S. Ct. 2705, 2710, 180 L. Ed. 2d 610 (2011), Garcia claims Dr. LeVaughn's testimony was improper "surrogate testimony" for Dr. McGarry, the coroner who performed JT's autopsy.

¶103. Garcia admits he did not object to Dr. LeVaughn's testimony. And "[i]f no contemporaneous objection is made, the error, if any, is waived. This rule is not diminished in a capital case." ***Ronk v. State***, 172 So. 3d 1112, 1134 (Miss. 2015) (quoting ***Cole v. State***, 525 So. 2d 365, 369 (Miss. 1987)).

¶104. Still, Garcia asks this Court to review for plain error. "Under the plain-error doctrine, [this Court] can recognize obvious error which was not properly raised by the defendant and which affects a defendant's fundamental, substantive right." ***Ambrose v. State***, 254 So. 3d 77, 136 (Miss. 2018) (quoting ***Conners v. State***, 92 So. 3d 676, 682 (Miss. 2012)). "For the plain-error doctrine to apply, there must have been an error that resulted in a manifest miscarriage of justice or seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* Here, there was no error at all—let alone one that resulted in a manifest miscarriage of justice.

48

¶105. In ***Bullcoming***, the Supreme Court was presented with a specific question:

> whether the Confrontation Clause permits the prosecution *to introduce a forensic laboratory report containing a testimonial certification*—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification.

***Bullcoming***, 564 U.S. at 652 (emphasis added). The plurality answered this question by holding "that surrogate testimony of that order does not meet the constitutional requirement." *Id.*

¶106. But this Court is not presented with the same question. The State did not admit Dr. McGarry's autopsy report through Dr. LeVaughn. So Bullcoming's specific concern of "surrogate testimony" is not at issue. Instead, Dr. LeVaughn was admitted as an expert in pathology. And he gave his *independent* expert opinion that JT had been sexually assaulted before she died and that she died by strangulation. As Garcia points out, Dr. LeVaughn did rely in part on Dr. McGarry's autopsy report and Officer Koon's autopsy photos to form his expert opinion. But this fact does not place his testimony in the ***Bullcoming*** surrogate-testimony category.

¶107. As Justice Sotomayor noted in her special concurrence, ***Bullcoming*** was "not a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence." *Id.* at 673 (Sotomayor, J., concurring). "We would face a different question," she observed, "if asked to determine the constitutionality of allowing an expert witness to discuss others' testimonial statements

49

if the testimonial statements were not themselves admitted as evidence." *Id.* (Sotomayor, J., concurring)).

¶108. The Supreme Court faced this different question in *Williams v. Illinois*, 567 U.S. 50, 67, 132 S. Ct. 2221, 2233, 183 L. Ed. 2d 89 (2012). And a plurality concluded expert testimony of this nature does not violate the Confrontation Clause because the out-of-court statements on which the expert relies are not being offered to prove the truth of the matter asserted. Rather, they explain the assumptions on which the opinion rests. *Id.* at 57-58 (Justice Alito authored the judgment, joined by Chief Justice Roberts and Justices Kennedy and Breyer. Justice Thomas concurred in the judgment.). A majority of this Court has similarly agreed that an expert pathologist called to give her independent opinion as to cause of death does not violate *Bullcoming*'s surrogate-testimony prohibition. *Christian v. State*, 207 So. 3d 1207, 1225 (Miss. 2016) (Justice Maxwell specially concurred, joined by Chief Justice Waller, Presiding Justice Randolph, and Justices Lamar, Coleman, and Beam.).

¶109. Thus, Garcia's *Bullcoming* argument lacks merit. And the trial judge did not plainly err by admitting Dr. LeVaughn's expert testimony.

## IV. RECUSAL

**Issue 5:** **Once Garcia waived his right to a jury at sentencing, should the trial judge have recused *sua sponte* based on either her pre-sentencing exposure to information not ordinarily presented to the jury or her personal views on the death penalty and Garcia's mitigation theory?**

¶110. Next, Garcia argues he "was deprived of a fair sentencing tribunal because the judge's pretrial exposure to confidential information that would ordinarily not be known to a

sentencing factfinder, and her self-admitted predispositions and intention to consider extra-record matters disqualified her from being the trier of fact." Essentially, Garcia characterizes the trial judge's warnings to Garcia about what he would be giving up if he chose bench sentencing over jury sentencing as the judge's "free admi[ssion] . . . that she would be following her own predelictions [sic] and pre-existing perception, as well as information outside the record, in arriving at a sentencing decision." Based on this alleged admission, Garcia claims the trial judge should have recused, even though Garcia concedes he never asked her to.

¶111. Because Garcia never sought the trial judge's recusal, this claim is procedurally barred. *Rice v. State*, 134 So. 3d 292, 299 (Miss. 2014) (holding that a petitioner's claim of a biased trial judge was procedurally barred on appeal due to the failure of the petitioner to file a motion to recuse at trial). Garcia chose to waive his right to a jury for sentencing *after* the trial judge's thorough explanation of the disadvantages and differences of judge sentencing, as opposed to jury sentencing. Specifically, the trial judge brought to Garcia's attention the very circumstance Garcia now claims made his sentencing hearing fundamentally unfair—the fact the judge had been privy to information that a jury would never see. Aware of this reality, Garcia chose to forego his right to jury sentencing. So he cannot now craft those warnings into a claim that the trial judge's acting as sentencer was fundamentally unfair.

¶112. Further, his complaint that the judge should have recused *sua sponte* based on her own admitted impartiality or inability to be fair has no merit. This Court recognizes that "trial

51

judges are confronted daily with evidence that would tend to make defendants appear more culpable than not. We presume that our trial judges are aptly equipped to handle these issues and apply the law without fear of undue prejudice." *Scott v. State*, 8 So. 3d 855, 860 (Miss. 2008). The transcript of the January 17, 2017 waiver-of-jury-sentencing hearing speaks for itself. Nowhere does the judge insist she would follow her own predispositions or base her decision on information outside the record. Instead, the trial judge carefully explained her background and that she was privy to information and experiences that a jury would not possess. She also gave Garcia multiple opportunities to withdraw his motion to waive jury sentencing after consulting with counsel. So, despite Garcia's attempt to mischaracterize the judge's words and actions, the judge's January 17, 2017 conversation with Garcia leaves no doubt about the validity of the presumption that Judge Dodson, "sworn to administer impartial justice, [wa]s qualified and unbiased." *Jones v. State*, 841 So. 2d 115, 135 (Miss. 2003).

¶113. In addition to the January 17, 2017 hearing, Garcia points to the trial judge's comment to Dr. Storer at the November 22, 2016 competency hearing that she "would rather have the death penalty than a life without for several reasons[,] [o]ne of which is that I would have my own cell where no one else would be and my own things that no one else would bother." Garcia claims this is evidence of a predisposition toward the death penalty that might have impacted her sentencing decision.

¶114. But again, Garcia never sought to have the trial judge recuse based on this statement, which was made months before he decided to waive jury sentencing. So again this issue is

procedurally barred. *Rice*, 134 So. 3d at 299. Further, this one comment taken out of context is not evidence that the judge was so biased in favor of the death penalty that she should have recused *sua sponte*. Instead, a fuller reading of the record belies Garcia's accusation that the judge was biased. At the end of the November 22, 2016 hearing, the judge explained to Garcia that her comment—which was made in the context of whether it was irrational to prefer having one's own room on death row—was merely part of an academic exercise and was by no means intended to sway Garcia one way or another. Moreover, during the January 17, 2017 hearing, the judge explained to Garcia that, in her previous roles of prosecutor and defense attorney, she had argued for *and* against the death penalty. Before she accepted Garcia's waiver of jury sentencing, the judge questioned Garcia as to whether he believed, "if the proof is there that [she] would have any hesitation at all in imposing the death penalty" and "if the proof is not there that [she] would have any hesitation at all in imposing life without parole." And she only accepted his waiver of a jury after Garcia assured her he was "not hedging [his] bets here thinking [the judge] would lean one way or the other[.]" Instead, Garcia stated that he understood that the judge would make a sentencing decision just as a jury would.

¶115. Finally, Garcia asserts the sentencing order revealed the trial judge's "disqualifying views." Specifically, he alleges that the trial judge categorically rejected the mitigation evidence presented by Dr. Storer. But the order shows the judge did consider Dr. Storer's mitigation testimony. The order also shows she properly considered his testimony in the

context of mitigation and did not, as Garcia claims on appeal, use this mental-health evidence offered in mitigation as an aggravating factor justifying the death penalty.

¶116. "In determining whether a judge should have recused h[er]self, the reviewing court must consider the trial as a whole and examine every ruling to determine if those rulings were prejudicial to the complaining party." *Jones*, 841 So. 2d at 135 (citing *Hunter v. State*, 684 So. 2d 625, 630-31 (Miss. 1996)). Reviewing the record as a whole, there is no evidence to support Garcia's contention that, despite not moving for the trial judge's recusal, the trial judge still should have disqualified herself *sua sponte* based on personal bias or an inability to be impartial.

## V.    DEATH PENALTY

**Issue 6:      Was the death penalty imposed on Garcia in violation of the United States Constitution?**

¶117. In his sixth issue on appeal, Garcia argues the trial judge erred by denying his pretrial motion to declare Mississippi's entire death-penalty statutory scheme unconstitutional. The trial judge rejected Garcia's motion, finding this Court's decisions have consistently found "that the current death penalty statutes are constitutional and that in fact the imposition of the death penalty as that process is outlined in our statutes and our case law is constitutional." On appeal, Garcia concedes the law supports the trial judge's ruling. He "acknowledges that majorities of neither this Court nor the United States Supreme Court have yet adopted the positions he takes here[.]" Yet he asserts his "positions are legally meritorious and warrant revisiting and abandoning any precedent inconsistent with them."

¶118. In addition to not being supported by the law, the same arguments Garcia asserts against the death penalty were advanced and rejected in two prior death-penalty appeals before the Court. *See Ambrose*, 254 So. 3d at 149-151 (rejecting the specific arguments that the failure to include *mens rea* factors or aggravating circumstances in the indictment renders the death sentence unconstitutional, that Mississippi's statutory death penalty scheme is unconstitutional for piecemeal reasons, and that Mississippi's capital statutory scheme permitting the imposition of a death sentence violates the Eighth Amendment *in toto*); *Evans*, 226 So. 3d at 36-40 (rejecting the specific arguments that use of the same crime to capitalize the homicide and as an aggravator violated the Eighth Amendment, that Mississippi's death-penalty scheme is generally unconstitutional, that the failure to include aggravating circumstances in the indictment renders the sentence unconstitutional, and that Mississippi's death-penalty scheme is unconstitutional for additional reasons). The one exception is Garcia's argument that this Court should revisit the constitutionality of the death penalty based on Justice Breyer's dissent from the denial of certiorari in *Jordan v. Mississippi*, 138 S. Ct. 2567, 2569-70, 201 L. Ed. 2d 1104 (2018) (Breyer, J., dissenting from the denial of certiorari).

¶119. In his dissent, Justice Breyer expressed concern over what he views as the "geographic arbitrariness" of the imposition of the death penalty. *Id.* at 2570. Justice Breyer observed how "[d]eath sentences, while declining in number, have become increasingly concentrated in an ever-smaller number of counties"—the Second Circuit Court District of Mississippi being one of those areas of concentration. *Id.* at 2569. And Justice Breyer

55

repeated his concern that two other capital defendants may have been sentenced to death, not because their crimes reflect the "worst of the worst" but because they committed those crimes in the Second Circuit Court District, which is where Garcia also committed his capital crime. *Id.* at 2570; *see also* **Reed v. Louisiana**, 137 S. Ct. 787, 197 L. Ed. 2d 258 (2017) (Breyer, J. dissenting from denial of certiorari) (arguing sentences originating from Caddo Parish, Louisiana, are geographically arbitrary); **Tucker v. Louisiana**, 136 S. Ct. 1801, 195 L. Ed. 2d 774 (2016) (Breyer, J., dissenting from denial of certiorari) (same); **Glossip v. Gross**, 135 S. Ct. 2726, 2761, 192 L. Ed. 2d 761 (2015) (Breyer, J., dissenting) (asserting that geographical arbitrariness is national in scope).

¶120.  In his brief, Garcia presents statistical data to support Justice Breyer's position.  But beyond Justice Breyer's dissent to a denial of certiorari, Garcia presents no law supporting his argument that the geographical concentration of the imposition of the death penalty renders the death sentences imposed in areas like the Second Circuit Court District of Mississippi arbitrary and thereby unconstitutional.  Justice Breyer pitched his geographical arbitrariness argument in his dissent in **Glossip** and was joined by just one other justice.  **Glossip**, 135 S. Ct. at 2761 (Breyer, J., dissenting).  The **Jordan** denial-of-certiorari dissent was at least the third time since **Glossip** that Justice Breyer has advanced his geographical-arbitrariness argument to no avail.  **Jordan**, 138 S. Ct. at 2569-70; **Reed**, 137 S. Ct. 787; **Tucker**, 136 S. Ct. 1801.  And Garcia cites no other state or federal courts that have ruled the death penalty unconstitutional based on the fact the death penalty has been imposed in higher

concentration in certain geographical areas, such as the Second Circuit Court District of Mississippi.

¶121.  Because Garcia provides no legal support for this argument that the trial judge erred by denying his pretrial motion to declare the death penalty unconstitutional on its face, we find no reversible error.

**Issue 7:      Is Garcia's death sentence constitutionally and statutorily disproportionate?**

¶122.  In his next issue, Garcia turns from a facial to an as-applied challenge of his death sentence.  He argues that, because he suffers from anxiety disorder, which he describes as a "severe mental illness,"[21] imposing the death penalty on him is just as categorically disproportionate as imposing the death penalty on a juvenile or someone who is intellectually disabled.  *See* **Roper v. Simmons**, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) (holding that execution of individuals who were under eighteen years of age at time of their capital crimes is prohibited by the Eighth Amendment); **Atkins v. Virginia**, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002) (holding that execution of intellectually disabled criminals is prohibited by the Eighth Amendment).  But the argument that an anxiety disorder exempts individuals from the death penalty was rejected by a majority of this Court in **Dickerson v. State**, 175 So. 3d 8, 17-18 (Miss. 2015).  As does Garcia, the defendant in **Dickerson** "liken[ed] the mentally ill to the mentally retarded and to juveniles, who have

---

[21] We note that the record does not support Garcia's argument that he suffers from a *severe* mental illness.  His own expert, Dr. Storer, testified that Garcia's anxiety disorder, while a mental illness, was "not a severe and persistent mental illness of the type that would alter someone's perception of reality."

'diminished personal culpability,' and who are constitutionally ineligible for the death penalty . . . ." *Id.* at 17 (citing *Atkins*, 536 U.S. 304; *Roper*, 543 U.S. 551). And he asked this Court to hold that mentally ill defendants are exempt from the death penalty. *Id.*

¶123. In response, this Court looked to the Fifth Circuit, which has repeatedly rejected the argument that suffering from a mental illness is the same as being intellectually disabled. *Id.* at 18 (citing *Ripkowski v. Thaler*, 438 Fed. Appx. 296, 303 (5th Cir. 2011); *In re Neville*, 440 F.3d 220, 221 (5th Cir. 2006); *In re Woods*, 155 Fed. Appx. 132, 136 (5th Cir. 2005)). More important, "the [United States] Supreme Court has never held that mental illness removes a defendant from the class of persons who are constitutionally eligible for a death sentence." *Id.* (quoting *Ripkowski*, 438 Fed. Appx. at 303). This Court has held that it could not "take the *Atkins* opinion—which was so specific to mental retardation that the Court cited and discussed the clinical definition of mental retardation—and apply it to all other mental disorders." *Id.* "To do so would be no different than taking *Roper* and expanding it to preclude execution of criminals under age twenty-one, rather than age eighteen as the Supreme Court explicitly held." *Id.*

¶124. Garcia never argued to the trial court—let alone proved—he is intellectually disabled. In fact, Dr. Storer testified "Garcia has no deficits whatsoever regarding his intellectual functioning." *See id.* at 24 (defining intellectual disability as including "significantly subaverage intellectual functioning"). And because he was twenty-nine years old when he committed his capital crime, his reliance on *Atkins* and *Roper* is misplaced.

¶125. For the same reasons articulated in ***Dickerson***, we reject Garcia's argument that, based on his anxiety disorder, his death sentence in constitutionally disproportionate.

## VI.    CUMULATIVE ERROR

**Issue 8:    Did the trial judge commit errors, in themselves harmless, that cumulatively require reversal?**

¶126. As his final issue, Garcia argues cumulative error.  But a prerequisite of cumulative error is error.  The cumulative-error doctrine permits this Court, "[u]pon appellate review of cases in which [it] find[s] harmless error or any error that is not specifically found to be reversible in and of itself," to reverse when "the cumulative effect of all errors committed during the trial deprived the defendant of a fundamentally fair and impartial trial." ***Moffett v. State***, 49 So. 3d 1073, 1116 (Miss. 2010) (quoting ***Byrom v. State***, 863 So. 2d 836, 847 (Miss. 2003)).  Garcia has failed to demonstrate *any* errors occurred during his sentencing. Therefore, the cumulative-error doctrine does not apply.

## VII.   STATUTORY PROPORTIONALITY REVIEW

¶127. As a final matter, this Court must review the proportionality of Garcia's death sentence.  Miss. Code Ann. § 99-19-105 (Rev. 2015).

¶128. First, this Court must ask whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor.  Miss. Code Ann. § 99-19-105(3)(a).  We have already addressed in Section IV of this opinion Garcia's argument that the trial judge should have recused as sentencer based on allegedly admitted improper influences on her sentencing decision.  For the same reasons, we find Garcia's sentence was not influenced by passion, prejudice, or any other arbitrary factor.

¶129. Second, this Court must ask if the evidence support the judge's finding of statutory aggravating circumstances. Miss. Code Ann. § 99-19-105(3)(b). The judge found two aggravating circumstances—(1) Garcia killed JT during the commission of a sexual battery and (2) JT's murder was especially heinous, atrocious, and cruel. Miss. Code Ann. § 99-19-101(5)(d); Miss. Code Ann. § 99-19-101(5)(i). The record supports both findings. Garcia admitted under oath that he sexually assaulted five-year-old JT by inserting his penis in her anus. He also told the court that he thought she had died while he was raping her but only later realized she was merely unconscious. While Garcia claimed that JT had already been bound by the socks when he arrived at the trailer, Garcia admitted he was the one who decided to hang JT by her neck from the bathroom window. He did this so he could rinse his semen off her. He then left her half-naked body hanging from that window. In addition to these facts, other evidence demonstrated the especially heinous, atrocious, and cruel nature of Garcia's crime. In the days leading up to the crime, Garcia had conducted internet searches of the pornographic depiction of kidnaping and raping of young girls. If he was not the one who in fact kidnaped JT, he did admittedly rape her when presented with her small body, bound face down in a chair in a filthy trailer. An FBI agent later described it as the most disgusting crime scene he had ever worked. Dr. LeVaughn testified the sexual assault would have been painful and traumatic for the five-year-old JT. Dr. LeVaughn also opined that, based on the scratch marks on her neck, JT tried to free herself from the sock-based noose around her neck as she was strangled. So the evidence clearly supports the judge's finding of both statutory aggravating circumstances.

60

¶130. Finally, we must ask if the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Miss. Code Ann. § 99-19-105(3)(c).[22] When faced with the capital murder of a young victim committed during the course of sexual battery, this Court has repeatedly and consistently held that the death penalty is not disproportionate. *E.g.*, ***Loden v. State***, 971 So. 2d 548, 571 (Miss. 2007) (holding the death penalty was not disproportionate for capital murder committed during the commission of kidnaping and sexual battery of a sixteen-year-old); ***Havard v. State***, 928 So. 2d 771, 804 (Miss. 2006) (holding the death penalty was not disproportionate for capital murder committed during the commission of a sexual battery of a six-month-old infant); ***Evans v. State***, 725 So. 2d 613, 708 (Miss. 1997) (holding the death penalty was not disproportionate for capital murder committed during the commission of sexual battery of a ten-year-old); ***Walker v. State***, 671 So. 2d 581, 631 (Miss. 1995) ("find[ing] that a thorough consideration of Walker, his crime [of capital murder during the commission of sexual battery of teenager] and the sentence imposed in this case, as compared to . . . all other death penalty cases, indicates the death penalty is proportionate").

## Conclusion

¶131. Garcia was competent to waive his right to a jury at sentencing. This waiver included waiving his right to appeal his motion to change venue. Still, we additionally find the trial

---

[22] Because neither aggravating circumstance was found to be invalid, this Court does not have to address "whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error, or both." Miss. Code Ann. § 99-19-105(3)(d).

judge's denial of this motion was not an abuse of discretion. At the sentencing hearing, the trial judge did not err in her evidentiary rulings, did not improperly consider non-record evidence, and was not disqualified by any personal bias. Her decision that the aggravating factors outweighed the mitigating circumstances is supported by the record. And the sentenced imposed—death—is proportionate compared to other similar cases. Therefore, we affirm Garcia's sentence.

¶132. **AFFIRMED.**

**RANDOLPH, C.J., COLEMAN, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR. KING, P.J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J.**

**KING, PRESIDING JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶133. I disagree with the propriety of using a mock jury in this, or any, criminal case to determine whether a change of venue is warranted. However, because Garcia waived this issue, any error in using a mock jury is not reversible.

¶134. "Upon filing an application for change of venue supported by two affidavits affirming the defendant's inability to receive a fair trial, there arises a presumption that an impartial jury cannot be obtained." *Welde v. State*, 3 So. 3d 113, 118 (Miss. 2009). The State may then rebut that presumption "by proving from voir dire that the trial court impaneled an impartial jury." *Id.* (internal quotation marks omitted) (quoting *Holland v. State*, 705 So. 2d 307, 336 (Miss. 1997)). The State can use voir dire of the jury venire for the specific trial to rebut the presumption because "[i]t is fundamental and essential to our form of government that all persons charged with a crime have the right to a fair trial by an impartial

62

jury." ***White v. State***, 495 So. 2d 1346, 1348 (Miss. 1986).  In sum, the State can rebut the presumption with voir dire of the actual jury venire for the defendant's criminal trial, because the defendant is entitled to have a fair and impartial trial jury.  A mock jury does not suffice, as that jury will not be the same jury that tries the defendant.  It should never be a substitute for ensuring the impartiality of the impaneled jury for the defendant's trial.  Moreover, it should never be an excuse for a trial court to make a less-than-complete venue analysis; in other words, a trial court should not simply rely on its assessment of the mock jury and fail to complete a thorough venue analysis.  Additionally, I especially disagree with the use of a mock jury when the defendant objects to its use.  The juror sample used in a mock jury may be dissimilar to the jury venire for trial.  For example, the mock jury in this case was made up of thirty jurors, and it is unclear from which district they came.  For trial, the court planned on creating a special jury venire by sending out six hundred juror summonses.  Clearly, the dynamics of the two groups would likely be vastly different.

¶135.  However, the trial court in this case did conduct a thorough venue analysis in this case.[23]  Furthermore, the trial court gave Garcia the option to renew the motion to change venue once his actual jury venire was present, and Garcia waived this issue.  Garcia agreed to the use of the mock jury and failed to meaningfully object to the use of the mock jury on appeal, thus waiving the issue.  Even if this Court were to examine this issue under plain error review, considering the heightened standard we apply to death penalty cases, this issue would be without merit.  The trial judge repeatedly told Garcia and his defense counsel that

---

[23]The majority outlines the trial court's analysis on these issues.

63

Garcia could renew his motion to change venue once the jury venire was present.[24]  Thus, Garcia could have renewed his motion to ensure that his trial jury was impartial once his case had progressed to that stage of the proceedings.[25]

¶136.  I caution courts against using mock juries in motions for change of venue, because doing so is not a substitute for ensuring an impartial trial jury.  The impartiality of the trial jury, the impartial nature of such being a right guaranteed to defendants, can only be determined by considering the actual trial jury venire.  However, the use of a mock jury in this case did not prevent Garcia from raising the issue again once presented with his trial jury venire, as the trial court specifically expressed that he could raise his motion when faced with his venire.  Further, Garcia waived the issue.  Thus, I concur in part and in result.

**KITCHENS, P.J., JOINS THIS OPINION.**

---

[24]At one of the hearings on the motion to change venue, the trial court stated, "And of course . . . [denying the motion to change venue] does not prohibit the defense from raising it again should circumstances change or should we stay here, bring in a venire and it turns out that too many folks on the venire do have fixed opinions."

At a separate hearing on various matters, the trial court stated that "the court has already ruled on the motion for change of venue.  But as the parties well know if the situation changes, the defense is, of course, free to raise that again."

[25] I disagree with the majority that Garcia waived his appellate challenge to the venue issue simply by pleading guilty and waiving his sentencing jury.  However, the majority nonetheless analyzes the venue issue on the merits, and I agree with the majority's conclusion that the trial court did not err by denying the motion to change venue.  The problematic nature of the venue issue relates to the use of the mock jury, and Garcia waived a specific challenge to the use of the mock jury by agreeing to it, by failing to renew his motion to change venue, and by failing to meaningfully raise the issue of the mock jury on appeal."

# APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Abdur Rahim Ambrose v. State*, 254 So. 3d 77 (Miss. 2018).

*Curtis Giovanni Flowers v. State*, 240 So. 3d 1082 (Miss. 2017), *rev'd and remanded*, 139 S. Ct. 2228, 204 L. Ed. 2d 638 (2019).

*Timothy Nelson Evans v. State*, 226 So. 3d 1 (Miss. 2017).

*James Cobb Hutto III v. State*, 227 So. 3d 963 (Miss. 2017).

*David Cox v. State*, 183 So. 3d 36 (Miss. 2015).

*David Dickerson v. State*, 175 So. 3d 8 (Miss. 2015).

*Timothy Robert Ronk v. State*, 172 So. 3d 1112 (Miss. 2015).

*Curtis Giovanni Flowers v. State*, 158 So. 3d 1009 (Miss. 2014), *vacated*, 136 S. Ct. 2157, 195 L. Ed. 2d 817 (2016).

*Caleb Corrothers v. State*, 148 So. 3d 278 (Miss. 2014), *leave to seek PCR granted in part and denied in part*, 255 So. 3d 99 (Miss. 2017).

*Jason Lee Keller v. State*, 138 So. 3d 817 (Miss. 2014), *leave to seek PCR granted in part and denied in part*, 229 So. 3d 715 (Miss. 2017).

*Leslie Galloway III v. State*, 122 So. 3d 614 (Miss. 2013).

*Bobby Batiste v. State*, 121 So. 3d 808 (Miss. 2013), *leave to seek PCR granted*, 184 So. 3d 290 (Miss. 2016).

*Roger Lee Gillett v. State*, 56 So. 3d 469 (Miss. 2010).

*Moffett v. State*, 49 So. 3d 1073 (Miss. 2010).

*Pitchford v. State*, 45 So. 3d 216 (Miss. 2010).

*Goff v. State*, 14 So. 3d 625 (Miss. 2009).

*Wilson v. State*, 21 So. 3d 572 (Miss. 2009).

*Chamberlin v. State*, 989 So. 2d 320 (Miss. 2008).

*Loden v. State*, 971 So. 2d 548 (Miss. 2007).

*King v. State*, 960 So. 2d 413 (Miss. 2007).

*Bennett v. State*, 933 So. 2d 930 (Miss. 2006).

*Havard v. State*, 928 So. 2d 771 (Miss. 2006).

*Spicer v. State*, 921 So. 2d 292 (Miss. 2006).

*Hodges v. State*, 912 So. 2d 730 (Miss. 2005).

*Walker v. State*, 913 So. 2d 198 (Miss. 2005).

*Le v. State*, 913 So. 2d 913 (Miss. 2005), *leave to seek PCR denied*, 967 So. 2d 627 (Miss. 2007), *leave to seek second PCR granted*, 2013-DR-00327-SCT (Miss. Jan. 26, 2016).

*Brown v. State*, 890 So. 2d 901 (Miss. 2004).

*Powers v. State*, 883 So. 2d 20 (Miss. 2004)

*Branch v. State*, 882 So. 2d 36 (Miss. 2004).

*Scott v. State*, 878 So. 2d 933 (Miss. 2004).

*Lynch v. State*, 877 So. 2d 1254 (Miss. 2004).

*Dycus v. State*, 875 So. 2d 140 (Miss. 2004).

*Byrom v. State*, 863 So. 2d 836 (Miss. 2003).

*Howell v. State*, 860 So. 2d 704 (Miss. 2003).

*Howard v. State*, 853 So. 2d 781 (Miss. 2003).

*Walker v. State*, 815 So. 2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So. 2d 934 (Miss. 2002).

*Stevens v. State*, 806 So. 2d 1031 (Miss. 2002).

*Grayson v. State*, 806 So. 2d 241 (Miss. 2002).

*Knox v. State*, 805 So. 2d 527 (Miss. 2002).

*Simmons v. State*, 805 So. 2d 452 (Miss. 2002).

*Berry v. State*, 802 So. 2d 1033 (Miss. 2001).

*Snow v. State*,  800 So. 2d 472 (Miss. 2001).

*Mitchell v. State*, 792 So. 2d 192 (Miss. 2001).

*Puckett v. State*, 788 So. 2d 752 (Miss. 2001). * following remand.

*Goodin v. State*,  787 So. 2d 639 (Miss. 2001).

*Jordan v. State*, 786 So. 2d 987 (Miss. 2001).

*Manning v. State*, 765 So. 2d 516 (Miss. 2000). *following remand.

*Eskridge v. State*, 765 So. 2d 508 (Miss. 2000).

*McGilberry v. State*, 741 So. 2d 894 (Miss. 1999)*.*

*Puckett v. State*, 737 So. 2d 322 (Miss. 1999). *remanded for *Batson* hearing.

*Manning v. State*, 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State*, 735 So. 2d 238 (Miss. 1999).

*Turner v. State*, 732 So. 2d 937 (Miss. 1999).

*Smith v. State*, 729 So. 2d 1191 (Miss. 1998).

*Burns v. State*, 729 So. 2d 203 (Miss. 1998).

*Jordan v. State*, 728 So. 2d 1088 (Miss. 1998).

*Gray v. State*, 728 So. 2d 36 (Miss. 1998).

*Manning v. State*, 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State*, 726 So. 2d 524 (Miss. 1997).

*Bell v. State*, 725 So. 2d 836 (Miss. 1998), *post-conviction relief granted in part and denied in part*, 725 So. 2d 836 (Miss. 2011).

*Evans v. State*, 725 So. 2d 613 (Miss. 1997).

*Brewer v. State*, 725 So. 2d 106 (Miss. 1998).

*Crawford v. State*, 716 So. 2d 1028 (Miss. 1998).

*Doss v. State*, 709 So. 2d 369 (Miss. 1996).

*Underwood v. State*, 708 So. 2d 18 (Miss. 1998).

*Holland v. State*, 705 So. 2d 307 (Miss. 1997).

*Wells v. State*, 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State*, 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State*, 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State*, 684 So. 2d 1179 (Miss. 1996).

*Davis v. State*, 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581 (Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989); *Shell v. Mississippi*, 498 U.S. 1 (1990) (reversing, in part, and remanding); *Shell v. State*, 595 So. 2d 1323 (Miss. 1992) (remanding for new sentencing hearing).

*Davis v. State*, 551 So. 2d  165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989); *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) (vacating and remanding); *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) (remanding for new sentencing hearing).

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988); *Clemons v. Mississippi*, 494 U.S. 738 (1990) (vacating and remanding); *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) (remanding for new sentencing hearing).

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

***Jones v. State**, 517 So. 2d 1295 (Miss. 1987); **Jones v. Mississippi**, 487 U.S. 1230 (1988) (vacating and remanding); **Jones v. State**, 602 So. 2d 1170 (Miss. 1992) (remanding for new sentencing hearing).

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So.  2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

*Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCING PHASE

*Curtis Giovanni Flowers v. State*, 287 So. 3d 905 (Miss. 2019), *on remand from* 139 S. Ct. 2228, 204 L. Ed. 2d 638 (2019).

*Justin Barrett Blakeney v. State*, 236 So. 3d 11 (Miss. 2017).

*Sherwood Brown v. State*, 2017-DR-00206-SCT (Miss. Oct. 26, 2017) (order granting post-conviction relief and vacating underlying convictions and sentences and remanding to the DeSoto County Circuit Court for a new trial).

*Erik Wayne Hollie v. State*, 174 So. 3d 824 (Miss. 2015).

*Manning v. State*, 158 So. 3d 302 (Miss. 2015) (reversing denial of post-conviction relief).

*Byrom v. State*, 2014-DR-00230-SCT (Miss. April 3, 2014) (order).

*Ross v. State*, 954 So. 2d 968 (Miss. 2007).

*Flowers v. State*, 947 So. 2d 910 (Miss. 2006).

*Flowers v. State*, 842 So. 2d 531 (Miss. 2003).

*Randall v. State*, 806 So. 2d 185 (Miss. 2002).

*Flowers v. State*, 773 So. 2d 309 (Miss. 2000).

*Edwards v. State*, 737 So. 2d 275 (Miss. 1999).

*Smith v. State*, 733 So. 2d 793 (Miss. 1999).

*Porter v. State*, 732 So. 2d 899 (Miss. 1999).

*Kolberg v. State*, 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State*, 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State*, 702 So. 2d 388 (Miss. 1997).

*Howard v. State*, 701 So. 2d 274 (Miss. 1997).

*Lester v. State*, 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State*, 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*,  531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

# DEATH CASES REVERSED
## AS TO PUNISHMENT AND REMANDED
## FOR RESENTENCING TO LIFE IMPRISONMENT

*Bell v. State*, 160 So. 3d 188 (Miss. 2016).

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO
# PUNISHMENT AND REMANDED FOR A NEW TRIAL
# ON SENTENCING PHASE ONLY

*Fulgham v. State*, 46 So. 3d 315 (Miss. 2010).

*Rubenstein v. State*, 941 So. 2d 735 (Miss. 2006).

*King v. State*,  784 So. 2d 884 (Miss. 2001).

*Walker v. State*, 740 So. 2d 873 (Miss. 1999).

*Watts v. State*, 733 So. 2d 214 (Miss. 1999).

*West v. State*, 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State*, 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989); *Shell v. Mississippi*, 498 U.S. 1 (1990) (reversing, in part, and remanding); *Shell v. State* 595 So. 2d 1323 (Miss. 1992) (remanding for new sentencing hearing).

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989); *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) (vacating and remanding); *Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992) (remanding for new sentencing hearing).

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988); *Clemons v. Mississippi*, 494 U.S. 738 (1990) (vacating and remanding); *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) (remanding for new sentencing hearing).

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987); *Jones v. Mississippi,* 487 U.S. 1230 (1988) (vacating and remanding); *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) (remanding for new sentencing hearing).

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989), *sentence aff'd*, 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984), *aff'd*, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied*, 479 U.S. 1036 (1988), *resentencing ordered*, 635 So. 2d 802 (Miss. 1993), *following writ of habeas corpus issued sub nom. Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992), *resentencing affirmed*, 691 So. 2d 959 (Miss. 1997).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984) (case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing).